(101 South. 24)

No. 26371.

## SMITH v. DIXIE OIL CO., Inc.

(May 12, 1924. Rehearing Denied July 8, 1924.)

*(Syllabus by Editorial Staff.)*

1. **Navigable waters** ☞1(7)—**Evidence held to establish navigability of stream.**

Evidence *held* to establish navigability of waterway at time of admission of state to Union.

2. **Navigable waters** ☞36(1)—**Bed of navigable stream, property of state, subject to mineral lease.**

At time of admission of state to Union, bed of navigable stream below low-water mark became property of state, subject to public's right to navigate it and use its banks, and subject to mineral lease by state.

Appeal from First Judicial District Court, Parish of Caddo; J. H. Stephens, Judge.

Action by E. Kirby Smith against the Dixie Oil Company, Inc., wherein the State of Louisiana, Mrs. Sarah J. Robertshaw and others intervened. Judgment for defendant Dixie Oil Company, and plaintiff and interveners other than the State appeal. Affirmed.

John B. Files, Hampden Story, and Wilkinson, Lewis & Wilkinson, all of Shreveport, for appellant Smith.

A. V. Coco, Atty. Gen., for the State.

Foster, Looney, Wilkinson & Smith, of Shreveport, for appellants Robertshaw and others.

Robert A. Hunter, of Shreveport, for appellee.

By the WHOLE COURT.

ROGERS, J. Under a mineral lease from the state of Louisiana defendant drilled an oil well in the bed of Black bayou in sec. 13, T. 21 N., R. 15 W., Caddo parish.

The well was brought in as a producer, and thereafter plaintiff filed this suit, alleging that he was in actual possession, as owner, of Sec. 12, T. 21 N., R. 15 W., Caddo parish, and that he was the holder of a mineral lease covering a tract of land in the northeast quarter of section 13, same township and range; alleging that there runs through the lands in sections 12 and 13 "a shallow and nonnavigable stream known as Black bayou," on the east side of which abuts the lands possessed by him; alleging that as the proprietor and possessor of the east bank of said bayou he owns and possesses the bed of said stream to its center, and has been in actual physical possession thereof for more than twelve months; alleging that the defendant entered and trespassed upon that part of the bed of Black bayou belonging to petitioner by drilling the well hereinbefore referred to. Plaintiff prayed to be maintained in quiet and peaceful possession of said land, for restraining orders, sequestration, and for the value of the oil removed and extracted from the land and disposed of by defendant.

Defendant, for answer, denied plaintiff's possession, and alleged that Black bayou was a navigable stream, or, in the alternative, that it was a navigable stream in the year 1812, when Louisiana was admitted into the Union. Defendant further alleged that the bed of said bayou on which the well was drilled was the property of the state by virtue of its sovereignty, and that it was occu-

pied by defendant under the terms of an oil and gas lease from said state.

The state of Louisiana, through its Attorney General, intervened for the purpose of resisting the demands of plaintiff and to protect the possession and rights of defendant.

Mrs. Sarah J. Robertshaw, Mrs. Ethel Dillon Walsh, and Mrs. Katherine Reid likewise intervened, alleging that they were the owners in possession of the property in controversy, and that defendant had trespassed on said property by drilling an oil well thereon. Interveners prayed to be decreed the owners of the property and the oil, and for an accounting of the production of the well.

The court below rejected the demands of plaintiff and of Mrs. Sarah J. Robertshaw, Mrs. Ethel Dillon Walsh, and Mrs. Katherine Reid, interveners, and dismissed the suit and intervention. From this judgment plaintiff and said interveners have appealed.

[1] The paramount issue presented by the pleadings is the navigability, vel non, of Black bayou in 1812, the year of the admission of Louisiana into the Union. If the stream was navigable at that date, its bed belongs to the state. If it was not navigable at that time the ownership of the bed of the bayou must be determined as between plaintiff and the Robertshaw interveners.

The lines of investigation to determine the controversy led through the examination of such witnesses as were able to give testimony in regard to facts bearing upon the issue, such as the actual navigation by steamboats and other craft and the physical conditions of the stream within their knowledge; through the examination of historical records, of surveys, past and present, and of photographs; and through consideration of the opinions of pre-eminent geologists and ecologists, based upon careful study of the physical characteristics of the bayou and the sources of its water supply.

The district judge, who heard the evidence and had before him each exhibit as it was offered, held that Black bayou was a navigable stream in 1812, and from our painstaking examination of the record we have reached the same conclusion.

Black bayou has its source in the state of Texas, and enters the state of Louisiana in the northwestern corner of the parish of Caddo. It flows in a southeasterly direction through the northern portion of the parish, and empties into Clear Lake. Clear Lake was one of a chain of navigable lakes, all connected, but separately named which, prior to the removal of the Great Raft from Red River, existed on the west bank of the river above Shreveport. The other lakes were known as Cross, Ferry, Sodo and Shift Tail Lakes. With their connecting bayous, among which were Black bayou, Red bayou, Stumpy bayou and Twelve Mile bayou, this chain of lakes extended for over 100 miles, and was the steamboat route from Shreveport to Jefferson, Tex. At a point about 1 mile south of Rodessa, La., where the Kansas City Southern Railroad crosses the stream, Black bayou is a small creek, but has a definite channel. It then spreads out into a large swamp, but after leaving the swamp, and about 3 miles above its confluence with Kelly bayou, a tributary from the north, it again assumes a well-defined channel. Thereafter the bayou flows more directly south and takes its position in the Red River Valley at the foot of the slope away from the river. At about half a mile south of the junction of Kelly bayou and Black bayou the latter stream crosses the west line of section 12, and about a half a mile further south, it meets a waterway known as "Sewall's canal," which connects Black bayou and Red bayou. The well in controversy was drilled in the bed of Black bayou between the last designated points in section 13 at a spot opposite Irving's Bluff; and is situated about

200 feet northwest of the junction between Black bayou and the so-called Sewall's canal.

From the point where it intersects the west line of section 12 to its mouth at Clear Lake, Black bayou flows through sections 13, 24, 23, 26, 27, and 28. During the whole of this stretch the bayou possesses a broad deep channel with well-defined but gently sloping and well-rounded banks. On the line between sections 11 and 12 Black bayou is 250 feet wide; on the line between sections 12 and 13 it is 471 feet wide. On the various section lines between Sewall's canal and its mouth, the width of the stream is even greater, being at one point 680 feet wide. The depth of its water varies from a minimum of 7 feet on the line between sections 11 and 12 to a maximum of 26 feet on the line between sections 27 and 28.

In the year 1812 the bayou was approximately the same width as it is now, but its depth was greater. This is shown by existing facts within the memory of living witnesses; by the results of the geological and ecological observations made by eminent scientists; and by the historical data assembled in connection with inquiry.

About the year 1777 the head of the Great Raft, which had been in the process of formation in Red river for many years, reached a point above the present site of the city of Shreveport, causing the water of the river to back up and overflow into the Black bayou basin. This resulted in the precipitation of practically two-thirds of the Red river water through the bayou, raising its level, and creating Clear, Sodo, Ferry, and other lakes. The situation remained unchanged until 1873. In that year the United States government completed its operations for the removal of the raft, which it had begun, through Captain Henry Shreve, in 1833. Thereafter Red river, except in the overflow periods, carried its own water, thereby reduc-ing the general water level of Black bayou and its chain of connected lakes. This condition existed, without material change, until about 1903, when the water level was again reduced by the construction of levees closing the outlets of Red river, which in periods of high water fed Black bayou, and later on, by dredging out the mouth of the bayou, its water level suffered a further reduction.

The report of Captain Shreve made in 1835 to the chief engineer at Washington indicates that Black bayou was a large stream, and was actually navigated at that time. On January 18, 1855, Fuller, United States agent and engineer, Senate Documents No. 62, Second Section, Thirty-Third Congress, refers to the route of navigation above the raft as being through Red bayou and Sewall's canal to Black bayou, thence through Clear Lake, uniting with Stumpy bayou. And Lieutenant Woodruff, under whose superintendence the final removal of the raft took place, in a report submitted in 1873 to the Secretary of War, speaks of Black bayou as being a sluggish stream with a depth ranging from 30 to 50 feet and a width varying from 300 to 400 feet. In another report he recommends that the navigation to Jefferson, Tex., might be improved by the building of dams and locks, stating that Black bayou, with certain other bayous, "would doubtless supply water enough for the lock navigation proposed without assistance from the Red river overflow."

In 1847 the state Legislature adopted Act 268, requiring the state engineer "to finish the improvement, as soon as may be practicable" of Twelve Mile bayou, Lake Sodo; "thence through said lake to the mouth of Black bayou, thence up the same to the mouth of Red bayou, and from thence up said bayou to Red river." While this legislation could not change the character of the stream, it offers a strong presumption of the navigability of the bayou at that early date. Accord-

ing to a map prepared by Alban & Oliver under the authority of an Act of the Legislature approved September 8, 1868 (Act No. 59 of 1868) and now forming part of the records of the state board of engineers, the route around the Red River Raft was from Shreveport to Red river, through Twelve Mile bayou, Sodo Lake, Stumpy bayou, or Shift Tail Lake, Clear Lake, Black bayou, Sewall's canal, and Red bayou. This map represents Black bayou as a stream of considerable size.

The course indicated on the map was used, within the memory of living witnesses, by steamboats from 1865 to 1873 at all stages of the water. From 1873 to 1894 there was also some steamboat navigation practically over the same route during high-water periods as far as the settlement now known as Gilliam on Red river.

It will thus appear that Black bayou was actually navigated as early as 1835, and that from 1865 to 1873 the navigation had risen to considerable proportions. It diminished thereafter due, in part, to the opening up of Red river itself, and, in part, to the construction of railroads.

During the years 1913 and 1914 the Department of the Interior, after a most comprehensive and exhaustive survey, reached the conclusion that Ferry Lake was a navigable body of water at the date of the admission of Louisiana into the Union, and that, consequently, the United States never had any title to the lake bed which belonged to the state by virtue of its sovereignty up to the contour line of 173.09 which was found to be the elevation of the mean high water mark.

Black bayou is a tributary of Ferry Lake. Its waters flow through Clear Lake and through the foot of Ferry Lake into Sodo Lake. Prior to the construction of the government dam at the mouth of Ferry Lake Black bayou and said lakes formed one continuous body of water separated by narrow channels. Since water seeks its level, the water surfaces of the bayou and lakes in 1812 were identical.

The mean high-water level of Ferry Lake as of date 1812 was determined by Mr. Arthur T. Kidder, Supervisor of Surveys for the General Land Office of the United States. He was assisted in his work by three eminent scientists, who have testified in this case, viz., Dr. Henry C. Cowles, professor of plant ecology in the University of Chicago; Mr. L. L. Janes, an ecologist in the employ of the United States government; and Mr. George C. Matson, some time professor of geology in Cornell and Chicago Universities, and for ten years a member of the United States Geological Survey.

These witnesses became familiar with Black bayou in connection with their investigations of Ferry Lake. Before testifying in the present case, however, they spent several weeks in a special examination of the bayou. The 173.09 contour was projected from Ferry Lake and Clear Lake up Black bayou to a point near the well. A study was made by Dr. Cowles and Mr. Janes of the tree growth below and above the line. The bed and banks of the stream were examined geologically by Professor Matson. The ecologists found young cypress trees growing below the 173.09 contour, and stumps, more than 150 years of age, opposite each other below the well. They testified that the small trees on the slope indicate the extent of the subsidence of the water level after the removal of the raft, and that the old stumps show the pre-raft conditions. Professor Matson testified that the banks of the bayou show weathering, but no erosion. The testimony of these witnesses was corroborated by that of Mr. Gervais Lombard, assistant chief of the state board of engineers, who by reason of his official duties, was thoroughly familiar with the stream. All

of these witnesses agree that the bayou has not widened materially since 1812.

In support of his contention that Black bayou was a shallow and nonnavigable stream in 1812, plaintiff offered in evidence certain official surveys and documents, which we have carefully examined. Our conclusion in respect of these records is in accord with that of the district judge, and we have availed ourselves of the following, from his able opinion, as correctly expressing our own views, viz.:

"The plaintiff, in an effort to show that Black bayou was not a navigable stream in 1812, relies primarily upon three documents.

"(1) The plat of a survey made by Williamson Jones, Dy. U. S. Surveyor, in 1837. The field notes of the survey show that in running the section line between sections 12 and 13 the surveyor crossed Black bayou, giving its width as 100 links, and did not traverse it.

"Assuming the correctness of the survey, which requires a considerable strain on the imagination in view of the overwhelming evidence to the contrary, it does not necessarily follow therefrom that Black bayou was not a navigable stream neither at that time nor in 1812; and the opinion of the surveyor, as indicated by his failure to meander the streams, that it was nonnavigable could certainly have no binding effect upon the state of Louisiana. The bayou was evidently navigable at the time of the survey and prior thereto. The state owned the bed of the bayou, not by grant from the government, but by virtue of its sovereignty.

"(2) The geological notes of H. C. Collins, assistant engineer. This report which was made to the Secretary of War in 1873, had included therein the statement that Black bayou in 1839 and 1840 was a very small stream with no Red river water running into it. Collins does not state upon what he bases his assumption, and we are of the opinion that the evidence as a whole, but particularly the report of Captain Shreve, hereinafter quoted, refutes it.

"(3) Historical documents that indicate that Lieutenant Sewall excavated what is known as 'Sewall's canal' in 1839, and thus by artificial means made Black bayou a navigable stream by giving it more direct connection with the river above the raft through Red bayou. We are convinced that Sewall cut no new channel from Black bayou to Red bayou, that he did not create navigation, but that he improved navigation then existing in its crude way for the more exacting demands of improved vessels of commerce.

"It must be remembered that navigation in 1812, and for a number of years thereafter in the South, meant transportation by scows, rafts, dugouts, and canoes. It was in 1807 that Fulton launched the 'Clermont' on the Hudson, and in 1813 he published a work entitled 'The Practicability of Navigating with Steamboats on Southern Waters.'

"In 1835 Captain H. M. Shreve made a report to the chief engineer at Washington, D. C., with regard to the removal of the raft; this report was copied into the record, pages 602 to 609. On page 605 of the record we find the following statement made by Captain Shreve:

" 'On the 19 of March the steamer Souvenir passed through Anderson's bayou to Bayou Pierre, thence in the Old River above the mouth of Bayou Pierre, and commenced operations on the first raft above Coate's bluff, being that entire section of the raft around which Lieutenant Sewall excavated a ' canal some years since. That boat, with a crew of officers, mechanics, and laborers, to the number of thirty, effectually removed the whole raft in 15 days at an expense of about $520. On the 13th of April the work was all finished as high up as Soda bayou, 15 miles above the canal. Through this bayou the boats pass that transport goods, produce,. etc., to and from the country above the raft. It is only navigable for keel boats at the highest stage of water. The distance from its junction with the river through Sodo Lake and Black bayou into the ·river above the raft is estimated at 48 miles. About two-thirds of the water of Red river flows down through these bayous and lakes, being forced out of the river at the head of the raft by the back water formed by the masses of timber crowded into the channel.'

"According to the historical data relied upon by plaintiff, as noted above, Sewall's canal was dug in 1839; hence Shreve's report, which shows that two-thirds of the water of Red river flowed down Black bayou, Sodo Lake, and Soda bayou (now Twelve Mile bayou) antedated by several years the excavation of the canal. Thus the contention that Black bayou was widened and deepened as the result of the digging of Sewall's canal is untenable. Black bayou must necessarily have been a very large stream in 1835 to have carried two-thirds of the water of Red river.

"The report also sets at rest the contention

that there was no actual navigation on Black bayou prior to the work of Sewall in 1839.

"A careful reading of the report in connection with an occasional reference to the map of Caddo parish of that period shows clearly and unmistakably that the excavation by Sewall, referred to in the report, was made near what is now known as the city of Shreveport, on Red river. This interpretation of the language used is made certain by referring to the plat of the survey made by J. P. Terrell and A. W. Warren in 1838, and approved by the surveyor general in 1839, to be found in the Caddo parish clerk's office. At a point where the language of the report indicates that it should be, may be found the words, 'Sewall's Cut-Off.'

The so-called Sewall canal of 1839 is no canal at all, but a natural channel, of great age, running from Red bayou to Black bayou. This fact was established by the testimony of the engineers, geologist, and ecologists who made a thorough examination of that waterway. The canal is a meandering stream with well-developed and sloping banks. It has practically all of the characteristics of Red bayou as to size, sedimentation, hydraulic slope, and trees growing on the bank, some of the trees having the appearance of being several hundred years old. There is no line of demarkation between Red bayou and the so-called canal, which form a continuous meandering stream, entering Black Bayou at Irving's Bluff.

It is beyond comprehension how Lieutenant Sewall in 1839, without adequate machinery or force, could have excavated a waterway of the length, width, and depth as the so-called canal. The suggestion that the cut was made with a plow and four mules, so as to permit the washing out of the stream, requires a flight of imagination in which we are unwilling to indulge. Presumably the waterway was required by Lieutenant Sewall for immediate use. This purpose certainly could not have been accomplished by merely plowing a meandering ditch between the two points and awaiting the tedious process of its enlargement by means of the natural flow of the water.

In our opinion Lieutenant Sewall merely improved an existing channel running from Red bayou to Black bayou for the purpose of facilitating navigation around the raft. Even without this improvement, however, the evidence shows that Black bayou was navigable, and, together with Clear and Sodo Lakes and Twelve Mile bayou, afforded a route to Red river.

While in its present condition, and measured by present-day standards, Black bayou is nonnavigable, in the year 1812, and prior thereto, it was capable of being navigated to a point about three-quarters of a mile above its junction with the so-called Sewall's canal. At that date, therefore, it was, in law, a navigable stream whether it was actually so used or not. United States v. The Montello, 20 Wall. 430, 22 L. Ed. 391; St. Anthony Falls Water Power Co. v. St. Paul, 168 U. S. 349, 18 Sup. Ct. 157, 42 L. Ed. 497; Ingram v. Police Jury, 20 La. Ann. 226; Goodwill v. Police Jury, 38 La. Ann. 752; State v. Capdeville, 146 La. 94, 83 South. 421.

[2] Since Black bayou was a navigable stream at the date of the admission of Louisiana into the Union, all of its bed below its ordinary low-water mark became the property of the state, subject to the right of the public to navigate it and use its banks, in virtue of the state's inherent sovereignty. Pollard v. Hagan, 3 How. 212, 11 L. Ed. 565; Coyle v. Smith, 221 U. S. 573, 31 Sup. Ct. 688, 55 L. Ed. 853; Scott v. Lattif, 227 U. S. 229, 33 Sup. Ct. 242, 57 L. Ed. 490, L. R. A. (N. S.) 107; State v. Bayou Johnson Oyster Co., 130 La. 610, 58 South. 405; Perry v. Board of Commissioners, 132 La. 422, 61 South. 511; State v. Capdeville, 146 La. 106, 83 South. 421; Wemple v. Eastham, 150 La. 247, 90 South. 637.

The oil well drilled by defendant is not located upon either bank of the bayou but in

the bed of the stream slightly to the west of its center line and below the ordinary low-water mark as defined by the tree growth and vegetation. It is therefore on property which the state, as owner, had the right to lease to persons desiring to drill for oil. Wemple v. Eastham, 150 La. 247, 90 South. 637, and authorities there cited.

Judgment affirmed.

LAND, J., recused.