98 So.2d 236

**ESSO STANDARD OIL COMPANY**

v.

*Hunter* JONES et al.

No. 42986.

April 1, 1957.

On Rehearing Nov. 12, 1957.

Dupuy, Jr., Sp. Counsel to Atty. Gen., H. M. Holder, Sp. Asst. to Atty. Gen., for defendants-appellants.

Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, Blanchard, Goldstein, Walker & O'Quin, Shreveport, Dale, Richardson & Dale, Vidalia, for defendants-appellees.

SIMON, Justice.

This is one of two concursus proceedings provoked by the Esso Standard Oil Company, the purchaser of oil from two wells, wherein are cited the State of Louisiana, through the Louisiana State Mineral Board and Registry of the State Land Office as the owner of the bed of the Mississippi River by virtue of its inherent sovereignty, and Hunter Jones, et al., the riparian or littoral owners to assert their respective claims to the funds deposited in the Registry of the Court.

Both suits, presenting a similarity of parties and issues, were consolidated for trial in the district court. From an adverse judgment rendered in each case by the district court the State of Louisiana has appealed; and though said appeals have been consolidated for consideration by us, separate decrees will be rendered.

When these two cases were submitted to us we then entertained serious doubt as to

Jack P. F. Gremillion, Atty. Gen., George M. Ponder, First Asst. Atty. Gen., Edward M. Carmouche, Sp. Asst. Atty. Gen., Marc

the correctness of the conclusions reached by our learned brother below. After an exhaustive study of the issues presented, and

an extensive research of the pertinent authorities, we are convinced of the correctness of the findings of fact and the conclusions of law applicable thereto as presented in the well-reasoned opinion of the trial judge and we therefore adopt said reasons as the opinion of this Court, with footnotes added by us, which is as follows:

"In the first numbered and entitled suit above, Esso Standard Oil Company alleges that beginning February 27, 1951, it started purchasing oil produced from a well located as follows:

" 'North 75° 31' East 1250 feet, North 13° 30' West 660 feet from a point where Sections 9 and 10 intersect Meander Line 1828 in Sections 9 and 10, Township 4 North, Range 9 East, Concordia Parish, Louisiana.'

"The petition further alleges that some 36 named individuals and corporations and the State of Louisiana, State Mineral Board and the Register of the State Land Office are claiming .035719 of the royalty interest in said production; that the said Esso Standard Oil Company has deposited the money representing the net value of that royalty interest in the Registry of this Court and has caused said claimants to be cited to appear and assert in concursus their respective claims to that money.

"In the second numbered and entitled suit above, the petition of the said Esso Standard Oil Company alleges that beginning January 7, 1952, it commenced to purchase the oil produced from a well referred to as Carter-State Well No. 1 located as follows:

" 'From meander corner of Sections 9 and 10, Township 4 North, Range 9 East, run thence North 76 degrees 30 minutes East 1328 feet, thence North 13 degrees 30 minutes West 476 feet to location, Concordia Parish, Louisiana.'

"With few exceptions the same individuals and corporations and the State of Louisiana, State Mineral Board and the Register of the State Land Office are named as claimants of the full one-eighth (⅛) royalty interest in the production of this oil; that the said Esso Standard Oil Company has deposited the amount of money representing the net value of the said royalty interest in the Registry of this Court and has caused all of said claimants to be cited to appear and assert their respective claims to the money.

"The State of Louisiana, State Mineral Board and the Register of the State Land Office appeared and alleged that the well location in each of said actions is on land formerly constituting the bed and bottom of a navigable stream (the Mississippi River); that, therefore, the land belongs to the State of Louisiana by right of sovereignty, and for that reason all the money deposited in the Registry of this Court in each suit likewise belongs to the State. Also, in each proceeding all private claimants inter-

pleaded appeared and set up their claims to fractional royalty interests amounting to .035719 of the production of the well in the first suit and amounting to the one-eighth (⅛) royalty interest in the production of the well in the second suit and claiming all of the money deposits made in the Registry of this Court by the Esso Standard Oil Company in both suits. Their individual claims to the ownership of all the royalty interests are based on their ownership of a tract of land (or mineral interest therein) known as Roseland Plantation including all alluvion and accretions thereto, and that both wells are located on accretions to Roseland Plantation.

"There is no dispute amongst any of the private parties as to what is claimed to be the fractional royalty interest of each of them. These private claimants deny that the State of Louisiana has any interest in this money. Counsel for the State departments stipulated that so far as the State of Louisiana, the State Mineral Board and the Register of the State Land Office are concerned, in event the Court should hold that the property upon which the wells are bottomed is not owned by the State of Louisiana, et als., it is agreed and conceded that it is owned by the other claimants (meaning the private parties interpleaded herein) as amongst themselves. Thus, the question to be resolved by the Court is narrowed down to whether the oil was produced from land which is part of Roseland Plantation as a result of accretions as contemplated by the provisions of Article 509 of our [LSA–] Civil Code. If the determination is in the affirmative then all the money in both suits will belong to the private claimants in the proportions set out in their answers. If it is in the negative then all the money in both suits will belong to the said departments of the State of Louisiana.

"The two cases were consolidated for trial and while the evidence offered is applicable principally to Carter-State Well No. 1 referred to in the second suit, it is understood that because of the close proximity of the wells to each other the testimony will likewise apply to the other well. Preliminary to discussion of the evidence and the law it should be noted that up to 1933 the course of the Mississippi River formed an elongated horseshoe around Glasscock Point in Adams County, Mississippi. Also, that it was about four and a half (4½) miles across Glasscock Point at the mouth of the so-called horseshoe and about sixteen (16) miles along the bend of the river forming what is known as Deer Park Bend. Fronting on the Louisiana side of the lower prong of the bend were sections 5, 6, 7, 8 and 9 of Roseland Plantation in Concordia Parish, Louisiana, (S–2; James et als.–1, et seq.). Beginning in 1933 and by April of that year, as an aid to flood control the Army Engineers cut a high water channel along the four and a

half (4½) miles in a southerly direction across the mouth of the bend. This is referred to as the Glasscock Cut-Off channel. This channel was dry again by June of 1933. The Cut-Off channel was enlarged and more water flowed through from March through May of 1934. Then after more dredging the flow was resumed in the Cut-Off in December, 1934, and January, 1935, and some flow went through the Cut-Off continuously from about that date. Up to 1939 the old channel, often referred to as the bendway, was the main channel of commerce along the river (Tr. 22).

"Mr. Francis Geddes testified at considerable length and impressed me as being a thoroughly qualified witness on the questions involved by his many years experience along the Mississippi River and mainly because of his personal observations and knowledge of the conditions existing throughout the period under discussion at Deer Park Bend and along the Glasscock Cut-Off. At page 20 of the transcript he testified that the last time he visited the bendway was in May of 1955 just a few months before the trial of this case, and at that time a stream or current was flowing through the bend. Mr. Geddes further explained that from the beginning as the Cut-Off channel expanded there was less flow around the bend but that the flow was continuous through 1939, and at certain stages of the river to the present time (Tr. 19, 20, 22; James, et al.–29); that boats and barges used the old channel at certain seasons after the navigation lights were removed to the new channel to avoid the swift current in the Cut-Off (Tr. 21); that he has been stationed at Vidalia, Louisiana, since 1946 and from his own knowledge since he has known about Glasscock Cut-Off the water has run through Deer Park Bend each and every year at stages of the river lower than the state necessary to reach the levee (Tr. 92) and every time the water flows through, there has been alluvion formed by deposit of sediment on the banks. (Tr. 93) Mr. Geddes also stated that in general deposition was greater and faster in the upper arm of the bendway and fairly rapid over the last mile and a half at the lower end (Tr. 19). From the maps it is clear that the location of the wells would fall within the last mile and a half of the lower arm of the bendway.

"Mr. Heard, who is also a competent engineer, testified that the location of the James-State well, which is the well referred to in suit docket No. 45,708, was drilled as a straight hole; that Carter-State well, the well referred to in suit docket No. 48,714, is 260 feet southeast of the first well (Tr. 104, 105); that the Carter-State well was directionally drilled and while the angle from the surface is toward the river, the well is actually producing 245 feet above the bottom of the well. It was stipulated at the pretrial conference that the bottom hole location at the surface of the Carter-

State well is as follows: 'If a line be drawn perpendicularly from the bottom hole location to the surface of the Carter-State well that surface location is above the mean low water mark as shown on the hydrographic survey of 1948–51.'[1]

"Mr. Heard further testified that the surface location over the bottom of that well and the top of the other well are above high bank (Tr. 104) and both these wells are above the mean low water mark of 1951 (Tr. 107). He also refers to a fence which passes near the well locations toward the river which fence is further described by Mr. Davis. Mr. Heard made a survey shown by his map (James, et al.–34), which shows the land locations of the oil production of these wells to be well above the mean low water in 1951 and actually on the high bank. Counsel for the State agreed that he does not dispute Mr. Heard's survey (Tr. 112, 132; James, et al–34). As I view the map, that stipulation by Counsel for the State is a complete denial of the State's claim.

"Witness Sessions, a civil engineer, also identifies the well locations and testifies that these wells are located on a bar now forming the bank which adjoins and connects from the water of Deer Park Bend to Roseland Plantation. He also states that the bar was formed by alluvion and accretions as the river deposited the silt along the bendway, and that some of the fence posts along the fence referred to have been covered by the silt deposits. He explains that the stake in photograph James, et al.–35 is the surface location of the bottom of the Carter-State well (James, et al.–36, 37, 38, 39). These photographs show clearly that the bottom hole location is solid ground at the surface which extends back to the trees as a continuation of the high bank. A Mr. Davis works for the owners of the plantation which adjoins Roseland Plantation and the fence referred to was on the main land before the formation of the bar shown in the photographs. He said that he has repaired the fence each year since 1942; that the fence had been built prior to 1942 to what was then the water edge before the bar at the well location was formed; that as the bar was built up by deposits from the water passing along the bendway he extended the fence to the water's edge along the land line; that the bar has built up some every year during the time he has been there and that the water was running through Deer Park Bend.[2]

1. Expressions "mean low water mark" and "ordinary low water" are synonymous. East Boston Co. v. Commonwealth, 203 Mass. 68, 89 N.E. 236, 237.

2. This fence in 1942 extended toward the River beyond the point where the bottom hole of the Carter-State Well is now located.

See: Seibert v. Conservation Commission of Louisiana, 181 La. 237, 245, 159 So. 375.

"For the State Mr. Paul Farmer, who was employed by the Corps of Engineers at New Orleans, testified that he operated a dredge and closed the upper end of Deer Park Bend from the river on September 12, 1942, as indicated by the pictures offered as State –9–A to J. In this connection I comment that the fact that it was necessary to close the old channel to force more water along the new is convincing to me that there was still substantial flow of the current through the old channel. This is made more emphatic by his statement that this closure was made when the river was at extreme low stage. The bar closing the old channel was made by throwing a dirt fill across the bendway at the upper end. Mr. Farmer further testified that it only took him two or three days to throw up that closure in the manner shown by the photographs following which there was a rise of several feet in the river. That bar was washed out in December of that same year. (Tr. 152) Mr. Farmer testified at quite some length generalizing on what he had observed in other cut-offs along the river but he was frank to explain that he had never seen the conditions along Deer Park Bend firsthand. (Tr. 141) Therefore, as against the positive testimony of such witnesses as Geddes, Heard, Sessions and Davis, who are personally familiar with the development of the conditions along the bendway by personal observations and who know of their own knowledge that the flow

around this old channel, while not necessarily continuous every day, was almost continuous except at extreme low water in late years up to May, 1955, I attribute very little weight to Mr. Farmer's testimony. His testimony as he stated was only his 'estimation'. All his descriptive testimony on pages 142, 143, 144, 145, and 146 is given without his having any firsthand observations or knowledge of the conditions in this old channel. Mr. Farmer has seen other cut-offs and developments resulting therefrom, but it is my opinion that no two would act exactly alike.

"While Mr. White, another witness for the State, had traversed this bendway personally, I am unable to boil down his somewhat lengthy general statement so as to derive any practical helpful information. I find very little, if any, of his testimony is contrary to the end result of what witnesses Geddes, Heard, Sessions and Davis said. In fact, Witness White corroborated a great deal of the testimony of Geddes.

"Article 509 of our Civil Code reads as follows:

" 'Alluvion by accretion defined— Ownership—The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion.

" 'The alluvion belongs to the owner of the soil situated on the edge of the

water, whether it be a river or a stream, and whether the same be navigable or not, who is bound to leave public that portion of the bank which is required by law for the public use.'

"In this case able counsel for the State offers several exceptions to reliance upon Article 509 and some of his presentations are plausible to a degree in some respects, but my interpretation of the facts in this case and the law, particularly Article 509, does not permit me to adopt his reasoning. One of his contentions is that Article 509 cannot be applied because the hand of man had something to do with the change of the Mississippi River channel from Deer Park Bend to Glasscock Cut-Off. It is true that the Army Engineers cut what I understand to have been a small high water pilot channel as an aid to flood control and later enlarged the cut and caused additional water to flow through it, all of which, together with the natural action of the waters, finally resulted in the cut-off becoming the main river channel. In these steps there was no designed purpose whatsoever on the part of the engineers to bring about any change in property ownership. Counsel cities at length from Slattery v. Arkansas Natural Gas [Co., 138 La. 793], 70 So. 806. There was involved in that case claims resulting from derelictions under Article 510 of the Code as a result of the drying up of a lake, in which process the water receded from its banks on both sides

instead of the bank having been built up by depositions. That case had nothing to do with accretion by alluvion as contemplated by the provisions of Article 509. Article 509 in its language gives no support to plaintiff's contention. It is a matter for the application of equity principles. Obviously, should a riparian owner of land take a dredge in the middle of a stream, suck the dirt from the bottom and throw a bar along his property fronting on that stream, it would not be just to permit him to own the new land, particularly if it caused the current to move to the other side and bring about erosion of the opposite bank. The bar which Mr. Farmer threw up across the upper end of the bendway on September 12, 1942, was not accretion by alluvion. The acts of man played a part in the results described in the case of Ama[e]rada Petroleum Corporation v. The State Mineral Board, [203 La. 473], 14 So.2d 61, but, the Court held Article 509 applicable. Mr. Geddes testified that the cut-off channel affects the river current as far as fifty miles upstream and ten miles downstream (Tr. 24, 25). If accretion by alluvion deposits should occur in that area along the main river channel, I dare say no one would question the applicability of Article 509. Counsel quotes from an article in VII T.L.R. 444 which refers to the French commentators who say that: ' * * * batture thrown up quickly by the State is not alluvion in the sense that it belongs to the

adjacent proprietors.' The last sentence in the paragraph quoted by counsel from that article says this: 'However, if the batture is built up imperceptibly and slowly even though is it partly caused by the works of the State, then it is true alluvion and belongs to the riparian owners.' This is exactly our situation here.

"In this case counsel for James, et als. have made a translation from French commentators on the effect of man's act on the applicability of Article 556 of the Code Napoleon, which article is exactly the same as our 509. I quote the following from that part of counsel's brief:

" 'The application of the principle is not without difficulty when the works which bring about the alluvion have been performed by the state whether in the interest of navigation or industry. We do not think that this circumstance alone can modify the principle. The law is not based upon the cause which produces alluvion. It considers only the mode of formation of the accretions. If accretion is successive and imperceptible, there is alluvion, and the alluvion belongs to the riparian owners.

" 'It would be vain for the state to say that it had produced the alluvion;

that formed upon the bed because of the constructions made it should belong to the owner of the bed—that is the state in the case of a navigable stream. That objection falls before the text, which has no regard for the origin of the alluvion.' [3]

"Another contention is that whatever alluvion deposit has occurred was not successive and imperceptible as contemplated in Article 509. 'Successive and imperceptible' are well defined and easily understood terms. They must be accepted and applied as common usage would dictate. The growing of a plant is successive and imperceptible. But some plants grow faster than others. A homely example is a morning glory, which will cover the arbor in a few weeks and what is only a bud at eventide is a full blown flower in the morning. Its growth is phenomenally rapid, yet it is imperceptible at any given moment. The evidence here shows that in some years the bank built up by deposition was more rapid than in others, but that some build up took place each year after April, 1940. There is no evidence that one could stand on the side and perceive the development take place. It is within the knowledge of most everybody that flood waters may rise rapidly but unless the rise is some-

3. Laurent, Volume 6, No. 283, page 365. For other authorities see: Dallos Code, Article 556. Also: Demolombe, Des Biens 2, No. 65–69, pages 61 et seq.; IV Huc. No. 152, pages 190–192; VI Baudry-Lancantinerie, No. 378–392, pages 262–271.

thing extremely extraordinary, it would be imperceptible and I believe that the land built up to form the new bank at the location here is clearly proven to have been successive and imperceptible in the sense of the law.[4]

"The preponderance of evidence in this case is clear and convincing that up to 1939, while there had been some deposition in the upper arm of the bendway there had been little change toward the lower end, but thereafter, and while there was continuous flow, deposits commenced to build up the bank at the well sites and that this continued continuously each year. Naturally there was no deposition on the high banks at low water. The only way there can be accretion by alluvion on the bank is by the water at higher stage than the bank level. The build up was gradual by the year (James, et als.—29, 30, 31). If there is any paucity of proof to that effect by the engineers, then the testimony of Mr. Davis who was employed on the adjoining property is sufficient to supply it.

4. The Supreme Court of the United States in the case of St. Clair County v. Lovingston, 23 Wall. 46, 90 U.S. 46, 23 L. Ed. 59, after reviewing the Roman, Spanish, French (including Louisiana) and common-law authorities, with reference to alluvion makes the following statement:
"In the light of the authorities, alluvion may be defined as an addition to riparian land, gradually and imperceptible made by the water to which the land is contiguous.

"Counsel further contends that the deposit and bank build up were not on the edge of a river or stream in the sense of the language of the Codal Article. Counsel argues that the Mississippi River does not carry with it a change of the State and property lines. With that we agree. The State line will still follow the thalweg of the Deer Park Bend channel as it may change from year to year and if and when the old channel ceases to be a river or stream the location of the State line would be fixed and remain where it is on the happening of that event. As to property lines abutting the stream, they will follow the mean low water level wherever there is a change by accretion by alluvion so long as the alluvion is deposited by the current of a river or stream successively and imperceptibly. Counsel contends that Deer Park Bend ceased to be a river long before these wells produced the oil and before the mineral interests of these private claimants were acquired. If Deer Park Bend ceased to be a river, it then became a stream in the sense of the law, and it is still a stream

It is different from reliction, and is the opposite of avulsion. The test as to what is gradual and imperceptible in the sense of the rule is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on. Whether it is the effect of natural or artificial causes makes no difference. The result as to the ownership in either case is the same."

preserving the right of the abutting proprietors. Counsel doesn't say whether he agrees that a body of water may be a stream when it is not classified as a river. Definitely Deer Park Bend is not now the Mississippi River. There could be good argument that it is a prong or a branch of the river and, therefore, a river, but there can be a distinction between a river and a stream. It would be more correct, in my opinion, under the facts in this case to say that this old channel is now a stream. Apparently the language of the Article acknowledges that there is a distinction between a river and a stream. Smaller streams may go completely dry in the summer and resume their flow with the coming of winter rains. They must still retain their status as streams and when they do flow any accretions by alluvion would belong to the riparian owners where that takes place.[5]

"The opinion of Mr. Justice Rogers in Amerada Petroleum Corporation v. The State Mineral Board [203 La. 473], 14 So. 2d 61, fortifies my opinion here. I quote the following at page 69 [of 14 So.2d] which is a part of the written opinion of the trial court in that case:

" ' "On the other hand in all streams containing moving waters, which have the capacity of forming accretions, the lawmakers deemed it wise to pass these accretions to the owner of the property to which they became attached. It would indeed be arbitrary to give to the owners of land on a river the accretions to his land but to deny this right to landowners abutting a stream which is not technically or legally defined as a river, but which possesses all of the characteristics, of a river in the capacity of forming accretions. It, therefore, seems reasonable to me, as it must have to the lawwriters, to include other streams in the category of rivers. It seems to me that this inclusion was made to cover such a case as we are here presented with. We are dealing with a stream that possesses all of the characteristics of a river in its ability to remove and deposit dirt. No better evidence of this ability is needed than the fact that it has produced considerable accretions and particularly the accretion in question. Generally, a lake could not have so done because in it there is not sufficient moving water to form silt to the

5. It is not necessary that water continuously flow in order for the water course to be a river or stream. State ex rel. Olcott v. Hawk, 105 Or. 319, 208 P. 709, 714, 209 P. 607; Hebron Gravel Road Company v. Harvey, 90 Ind. 192, 46 Am.Rep. 199; St. Paul Fire and Marine Insurance Company v. Carroll, Tex. Civ.App., 106 S.W.2d 757, 758; Southern Pacific Company v. Proebstel, 61 Ariz. 412, 150 P.2d 81; Brasko v. Prislovsky, 207 Ark. 1034, 183 S.W.2d 925.

extent of forming additions to its banks.

" ' "Therefore, I can put no other construction on the inclusion of 'other streams' under the cited Article, than the one herein given, for we might very well ask ourselves the question, what streams would the lawmakers have reference to? In my opinion there is but one answer to this question, and it is: All streams whose water have the power to form accretions: and as the stream with which we are herein concerned has the power to form accretions, as it has done, it is then plain to me that it falls within the category of the streams mentioned in the cited article, and therefore, all accretions forming to its shores or banks belonging to the abutting property owners." '

"See, also, Seibert v. Conservation Commission of Louisiana [181 La. 237], 159 So. 375. The following is quoted from that opinion:

" 'It is the well-settled jurisprudence of this state that the contiguous riparian proprietor owns the bank of the river attached to his property, and this includes the alluvion or batture, and that the banks of rivers and/or streams is the land between the ordinary high water mark and the ordinary low-water mark. What is the ordinary low-water mark of the Mississippi River? The levee of the Mississippi River, by statute, is designated as the ordinary high-water mark; State v. Richardson, 140 La. 329, 72 So. 984; Wemple v. Eastham, et al., 150 La. 247, 90 So. 637; Pizanie v. Gauthreaux, 173 La. 737, 138 So. 650; Smith v. Dixie Oil Co., 156 La. 691, 101 So. 24; Boyce Cottonseed Oil Manufacturing Company v. Board of Commissioners, 160 La. 727, 107 So. 506.'

■ "In the present case at the present time there is not a constant or continuous flow at low water around the bendway every day in every year, but definitely the bendway is not a lake. When it does flow it is not drainage and the bendway gets its water from the main body of the Mississippi River. A stream is not required to flow every minute of the time. In this case the bendway is characterized by definite banks on each side, a definite bed, a natural current always downstream with the main body of the Mississippi River being the source of water supply. The current is capable of carrying alluvion and of depositing it along the banks. These characteristics fulfill every possible requirement of a stream and prevent the Deer Park Bend channel from being classified as a lake or pond up to this time. That location may change some time in the future becoming a dead lake, but it has not done so at this writing.

"State's counsel further contends that there is no showing in this record that the

land involved is above mean low water so as to make the land in question susceptible of private ownership. In view of what has been said heretofore as to the facts and the law and the authorities cited I do not deem that contention of sufficient merit to justify prolonging this discussion, particularly in view of the testimony of Mr. Geddes, Mr. Davis and Engineer Heard. Also it is my opinion that such a contention went out the window when counsel agreed with the correctness of and found no fault with Mr. Heard's survey and map (James et als.— 34)."

Accordingly, for the reasons hereinabove expressed, it is ordered, adjudged and decreed that there be judgment rejecting and dismissing the claim of the State of Louisiana, the Louisiana State Mineral Board and the Register of the State Land Office to the funds.

It is further ordered, adjudged and decreed that the funds deposited into the Registry of the District Court by plaintiffs herein be distributed and paid to the private claimants in the fractional proportion set out in the formal judgment of the district court.

It is further ordered, adjudged and decreed that there be judgment in favor of the Esso Standard Oil Company and against all claimants in this suit, relieving Esso Standard Oil Company of any liability to them with respect to the money in the Registry of the District Court hereby ordered distributed.

It is further ordered, adjudged and decreed that all court cost be paid out of the funds so deposited.

Judgment affirmed.

HAWTHORNE, J., absent.

On Rehearing

FOURNET, Chief Justice.

We granted a rehearing primarily because of the importance of this case, and also in view of certain expressions in the Report of the Special Master adopted by the United States Supreme Court in the case of State of Mississippi v. State of Louisiana, the decree in that case appearing at 350 U. S. 5, 76 S.Ct. 29, 100 L.Ed. 6.[1] In brief on rehearing counsel for the State concedes that the facts as stated by the trial judge.

---

1. This was an original action in the United States Supreme Court. By Order of October 26, 1953 (346 U.S. 862, 74 S.Ct. 102, 98 L.Ed. 374), D. K. McKamy, Esquire, of Birmingham, Alabama, was appointed Special Master to make findings of fact, state his conclusions of law thereon, and draft a recommended decree. The Court adopted but did not reproduce the report; the decree alone was approved and reproduced, in which "the true boundaries between the States of Mississippi and Louisiana at the places involved in this case" were found and concluded. A copy of the Master's Report has been furnished in this proceeding for the convenience of the Court.

and adopted in our original opinion are essentially and substantially correct, but urges that the Court erred in holding Deer Park Bend to be a stream rather than a cut-off lake, and alternatively—even if that ruling be correct—in applying Article 509 of the Civil Code, since here the works of man, by making an artificial avulsion in the river, reversed the natural processes and were the primary cause of the alluvion being formed.

At issue in this concursus proceeding is the ownership of funds derived from two oil wells. Carter-State No. 1 well is directionally drilled from the bank, with its bottom hole in what was once the main channel of the Mississippi River, but which is now land formed by accretion along the water's edge of a tract known as Roseland Plantation; Orren James No. 1 well is located on the high bank, but was unitized under a forty-acre unit of which eleven acres fall in what was once the bed of the river. Carter-State No. 1 well was probably drilled in late 1951, about a year after completion of the Orren James well, since this proceeding is concerned with funds derived from production beginning, in the case of Carter-State, on January 7, 1952, and in the case of Orren James, on February 27, 1951. Rival claimants for the funds are, on the one hand, the State of Louisiana, State Mineral Board and Register of the State Land Office, based on the State's ownership of the river bed by virtue of inherent sovereignty, and, on the other hand, private owners of fractional mineral interests, whose claim is that the land is true alluvion and belongs to the owners of Roseland Plantation by virtue of law.

The Louisiana Civil Code defines alluvion as "The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream," and declares "The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or stream, and whether the same be navigable or not, who is bound to leave public that portion of the bank which is required by law for the public use." Article 509. This article and the one which follows (Article 510), declaring a similar rule with respect to derelictions, are found under the title "Of Ownership" in the chapter concerned with the right of accession in relation to immovables. These articles are exactly the same as articles in our Codes of 1825 and 1808, and were taken almost verbatim from the French Civil Code (C. N., Articles 556 and 557). A difference between the Codes of Louisiana and France is noted in the omission from the Louisiana Code of the succeeding article of the French Code, expressly exempting lakes from the laws of alluvion and dereliction;[2] however, under the jurisprudence of this Court, those

2. Art. 558, French Civil Code (Richards' Tr. of the Official Ed. of 1804): "Alluvion does not take place with respect to lakes and ponds, the proprietor of

rights of accession have been limited to lands abutting "a river or other stream" and held to find no application to lakes.[3] Further, it has been held that lands reclaimed or suddenly formed by artificial process with public money or under public authority, though in a river, do not qualify as alluvion,[4] and the language of the Code requiring that the accretions be formed "successively and imperceptibly" to soil on the shore has been strictly construed.

Under the jurisprudence of France, the same rule has been frequently enunciated. Decisions dealing with the corresponding article of the Code Napoleon held that alluvion which formed in a river as a result of works executed by man or at the expense of the State belonged to the riparian owners in the same manner as that which was formed naturally, providing only that the formation should have taken place suc-

cessively and imperceptibly; but held otherwise in cases where, as a result of artificial works, accretion formed perceptibly and instantaneously.[5] This result is correct, according to the reasoning of some French commentators, because the text of the Code has no regard for the cause which produces the accretion, considers only the mode of its formation; and to require that the alluvion should result from the sole action of nature would add to the text in an unwarranted manner, thereby placing a new restrictive condition on the rights of the riparian owners without authority of law.[6]

Counsel for the State and its agencies, in support of their primary contention, i. e., that Deer Park Bend is a lake, argues that the bendway ceased to be a part of the Mississippi River and became a cut-off lake "when current ceased to flow in low water stages, and at that point *as a matter of law*

---

which preserves always the land which the water covers when it is at the pond's full height, even though the volume of water should be diminished.

"In like manner the proprietor of a pond acquires no right over land bordering on his pond which may happened to be covered by an extraordinary flood."

3. Zeller v. Southern Yacht Club, 34 La. Ann. 837; Slattery v. Arkansas Natural Gas Co., 138 La. 793, 70 So. 806; Bank of Coushatta v. Yarborough, 139 La. 510, 71 So. 784; Miami Corporation v. State, 186 La. 784, 173 So. 315; Amerada Petroleum Corp. v. State Mineral Board, 203 La. 473, 14 So.2d 61.

4. St. Anna's Asylum v. City of New Orleans, 104 La. 392, 29 So. 117; Heirs

of Leonard v. City of Baton Rouge, 39 La.Ann. 275, 4 So. 241, on rehearing 39 La.Ann. at page 285, 4 So. at page 246; see, also, Bruning v. City of New Orleans, 165 La. 511, 115 So. 733.

5. Code Civil Annoté par Fuzier-Herman (1885), t. 1, Art. 556, annotations under Sec. 2 at p. 748; Dalloz Répertoire de Législation, de Doctrine et de Jurisprudence (1885), t. 38, Propriété, p. 280 et seq., esp. secs. 496 and 497 at p. 289; Codes Annotes de Sirey (1875), t. 1, Art. 556, annotations at pp. 253–254.

6. For example, see F. Laurent, Principes de Droit Civil Français (3e éd. 1878), t. 6, Sec. 283, p. 365 et seq., and numerous French authorities whose views are summarized in the text.

the waters of the bendway became stagnant." This, he asserts, was the holding in State of Mississippi v. State of Louisiana, supra, which case involved a cut-off and abandoned channel of the Mississippi River similar to that with which we are here concerned.[7]

Briefly, the development of Glasscock Cutoff, following the initial dredging of a pilot channel in 1933 joining the two ends of the horseshoe-shaped portion of the river known as Deer Park Bend, extended over a period of years, during which water flowed through the cutoff only at times; and even after continuous flow was established, considerable additional work was necessary until at least 1939, during which period Deer Park Bend had continued to be the main channel of commerce on the river. In 1940 the cutoff became effective to the extent that it was capable of carrying the flow of the river at low stage; navigation lights were removed from the bendway, but it was still used by commerce, particularly by tows, because of the swift current in the cutoff. According to estimates based on Mean Sea Level elevations at Glasscock, in 1940 and 1941 there were some days when no flow occurred around the bendway, but in 1942 the flow was again probably continuous; and in September of that year a closure was constructed across the upper end of the bendway in an effort to withstand the low water season, thus to divert as much water as possible through the cutoff and at the same time to assist in enlargement of that channel. In December, 1942, due to high water, most of the closure was washed out, but evidently the purpose of the project had been accomplished. Thereafter, according to estimates by the experts who testified, the days when no flow occurred around the bendway varied with the stages of the river. About 1946 a closure in the form of a sandbar was first apparent at the mouth or lower end of the bendway, off Roseland Plantation (the location of the oil wells concerned in this

7. Counsel relies particularly on certain language found in the Report of the Special Master, adopted by the United States Supreme Court, wherein he observed: "I believe that when the old channel has so far deteriorated and become so filled by deposition as that it can no longer be used for navigation except in times of flood, it no longer has a thalweg. When the filling has proceeded to the point that no water can enter the channel at low stages of the river, which are normal during certain periods of the year, there is then no current in the old channel and the water has become stagnant.

"When this occurs (while at the same time the river itself remains a wide, deep, swiftly flowing stream capable of navigation at all stages), the old channel is no longer a part of the main river, even though water may flow during a part of the year in the old channel during periods of high water. The old channel is then no more a part of the river than the thousands of sloughs and swales found all up and down the Mississippi River which act as channels to carry flood waters from the river during high stages." Page 10, Report of Special Master.

case); prior to that time the volume of the flow around the bendway channel had kept material from backing up into the lower end and forming a fill. Meanwhile, the upper arm of the bendway, having received the greater amount of deposition, had filled considerably, and that portion of the former bed of the river has progressively become dry. However, water has run through Deer Park Bend every year, and is still doing so at the present time, when the river is at its stage lower than that necessary to reach the levee.

For purposes of disposing of the State's contention that the laws relating to alluvion do not apply because Deer Park Bend was, as a matter of law, a "cut-off lake" and not a stream, under the facts shown by the record in this case we might concede the correctness of what was said in the Special Master's Report (quoted in footnote 7), because the test "when current ceased to flow in low water stages in the bend" if applied here shows that, according to uncontradict testimony based on calculations as to rate of deposition, the bendway had closed at mean low water by "about 1946," though it could have been one year either way; yet at least three years before that date, i. e., in 1942, according to the evidence, a fence between Roseland and Point Pleasant plantations (adjoining on the south) was extended to the river's edge over a "bar" of soil then above water, which "bar" at that time extended probably a hundred yards further toward the water than the present surface location of the bottom hole of Carter-State No. 1 well. Comparison of maps in evidence, some of which are shown here,[8] which are said to give a general picture of changes that took place in the vicinity of Glasscock Cutoff and the old bendway over the period from 1933 to 1955, indicate a wide, water-filled channel through Deer Park Bend in 1945 and later, while estimates of the expert witnesses are to the effect that the greatest deposit of silt took place as the cutoff was developing (i. e., in the years following 1933), and that when the flow of water became intermittent, the deposit of silt in the bendway naturally began to decrease; all of which clearly shows that alluvion had already formed over what became the bottom hole location of Carter-State No. 1 well while water was still flowing continuously through Deer Park Bend.

But we should not fail to note the inaptness of the observations of the Special Master to the instant case. His purpose, in seeking the boundary between two states, was to determine when the bendway ceased

8. The year is indicated in the lower right-hand corner of each map. For the purpose of showing the location of the alluvion here concerned, we have indicated the approximate spot by arrow and circle on the 1949 map; it can be observed, however, on earlier maps, in lesser quantity.

to be the main navigable channel of the river—that being the crux of the matter since the jurisprudence of the United States Supreme Court decreed that the river's new bed, even though it had resulted from a natural avulsion, worked no change in the boundary between the states of Mississippi and Louisiana. He observed that although such boundary may shift, being affected as it is by natural processes of erosion and accretion, and although it follows always the varying center of the channel, in a case where the river left its old channel and sought a new bed the boundary became fixed at the thalweg or middle of the main navigable channel as it last existed before the sudden change—followed by the gradual filling of the old bed. This explains the pertinence of his conclusion that accretion ceases to apply when there is no longer a current through the old bendway at low water stages. Such a requirement is not found in Article 509 of the Civil Code, nor, so far as we are aware, under the jurisprudence interpreting that article. In our original opinion we approved the trial judge's conclusion that Deer Park Bend became a stream after it ceased to be a part of the river; that conclusion, he stated, was strengthened by the rationale of the case of Amerada Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So.2d 61, as shown by the quotation in our original opinion. Nothing has been said to cause us to change our view.

The State's alternative contention—that in any event the Court erred in applying Article 509 of the Civil Code because the process that took place in the bendway was not true accretion, but was rather the direct result of artificial avulsion—is also based on language in the Special Master's Report in State of Mississippi v. State of Louisiana, supra, in which it is said that when a river has changed its course "the gradual filling up of the bed that ensues is not to be treated as an accretion to the shores but as an ultimate effect of the avulsion." This is obviously correct since the river boundary between states *does* vary with the "gradual process of erosion and accretion" in the boundary stream (as observed by the Special Master); but once the boundary has become fixed because of the fact that the old channel is no longer the main navigable channel, it follows that the filling of the bed cannot be treated as an accretion so as to affect the boundary. Moreover, counsel admits that in the cases of Amerada Petroleum Corporation v. State Mineral Board, supra, and St. Clair County v. Lovingston, 23 Wall. 46, 90 U.S. 46, 23 L.Ed. 59, the laws of accretion were applied to rivers and streams even though the works of man contributed to the changes, but seeks to draw a distinction by asserting that in the case at bar the changes

were *primarily* caused by the works of man. No authority is cited supporting the distinction; and in the St. Clair County case, supra, the United States Supreme Court (as noted in our original opinion, footnote 4) laid down the test for "gradual and imperceptible," and observed that "Whether it [alluvion] is the effect of natural or artificial causes makes no difference. The result as to the ownership in either case is the same."

A supplemental brief has been filed by the State in which it is contended that the year 1941 is the critical date in this suit; that it was during 1941 when flow ceased around the bendway at low water stages; that, from testimony and data in the record, the bottom hole location of Carter-State No. 1 well was below mean low water mark in 1941; and the position of the State is summarized thus: "Up until 1941 the doctrine of accretion applied. According to the [United States] Supreme Court's interpretation, when water no longer flowed at the low water level the waters in the old bendway became stagnant as a matter of law and the doctrine of accretion ceased to apply." We think this has been answered by what is said above, and that further comment is unnecessary.

For the foregoing reasons and those previously assigned, our original opinion and decree are reinstated as the final judgment of this Court.

98 So.2d 250

**ESSO STANDARD OIL COMPANY**

v.

**STATE of Louisiana et al.**

No. 42987.

April 1, 1957.

On Rehearing Nov. 12, 1957.

Jack P. F. Gremillion, Atty. Gen., George M. Ponder, First Asst. Atty. Gen., Edward M. Carmouche, Sp. Asst. Atty. Gen., Marc Dupuy, Jr., Sp. Counsel to Atty. Gen., H. M. Holder, Sp. Asst. to Atty. Gen., for defendants-appellants.

Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, Blanchard, Goldstein, Walker & O'Quin, Shreveport, Dale, Richardson & Dale, Vidalia, for defendants-appellees.

SIMON, Justice.

This is one of the two concursus proceedings provoked by the Esso Standard Oil Company wherein are cited the State of Louisiana, through the Louisiana State Mineral Board and Register of the State Land Office. The issues herein presented are the same as those involved in the case of Esso Standard Oil Company v. Jones, 233 La. 915, 98 So.2d 236, both cases having been previously consolidated for purposes of trial and appeal.