162 So.2d 361 (1964)
STATE of Louisiana et al.
v.
Ernest COCKRELL, Jr. et al.
No. 5975.
Court of Appeal of Louisiana, First Circuit.
January 27, 1964.
Dissenting Opinion March 4, 1964.
Rehearing Denied April 6, 1964.
Writ Refused May 27, 1964.
*362 Jack P. F. Gremillion, Atty. Gen., John L. Madden, Asst. Atty. Gen., Baton Rouge, Cullen R. Liskow, Sp. Asst. Atty. Gen., Lake Charles, Melvin Evans, Charles B. Jarrett, Jr., New Orleans, and Frederick W. Ellis, Lake Charles, Richard E. Gerard of Liskow & Lewis, Lake Charles, by Cullen R. Liskow, Lake Charles, for appellants.
M. C. Thompson, Monroe, J. Mort Walker, Jr., New Orleans, Claude B. Duval, Houma, Sumpter P. Cousin, Shreveport, and S. W. Plauche, Jr., Lake Charles, by S. W. Plauche, Jr., for appellees.
Before ELLIS, LOTTINGER, HERGET, LANDRY, and REID, JJ.
LANDRY, Judge.
This is an action in trespass, properly considered as a petitory action, brought by the State of Louisiana, and its lessee, Gulf Oil Corporation, sometimes hereinafter referred *363 to as "plaintiffs", against Ernest Cockrell, Jr., and his lessee, Southern Natural Gas Company, sometimes hereinafter referred to and designated as "defendants". For a cause of action plaintiffs allege that during February, 1959, defendants wrongfully entered upon certain property belonging to the State of Louisiana, namely, a portion of the bed and bottom of a body of water known as Six Mile Lake, situated in St. Mary Parish. More particularly, plaintiffs assert defendants drilled a well known as the "Cockrell Well" and completed said well as a gas producer in paying quantities on or about April 5, 1959, and has continued said operation since that time to the detriment of plaintiffs. According to plaintiffs' petition, the well in question is situated approximately 700 feet northerly of the southern shore of Six Mile Lake and the present north boundary of Sections 45 and 46, Township 15 South, Range 11 East, St. Mary Parish.
In support of the State's claim of ownership of the property in question, plaintiffs' petition alleges the land in controversy is part of the bed and bottom of Six Mile Lake, title to which vested in and was reserved to the State by virtue of its inherent sovereignty when it was admitted as a state of the United States in 1812, and that the state has not since divested itself of such title by grant, sale or otherwise.
Upon the filing by defendants of an exception of non-joinder of parties defendant, plaintiff filed an amended petition impleading as defendants the owners of lands adjoining Six Mile Lake to the south of and opposite the well site alleging said persons had shared and were sharing in the proceeds of the production therefrom as lessors under certain recorded oil, gas and mineral leases pursuant to which the original defendants herein had drilled the well in question. Plaintiffs prayed that the State of Louisiana be recognized as owner of the land in controversy and Gulf Oil Corporation declared holder and owner of a valid oil, gas and mineral lease thereon as lessee of the State. In addition plaintiffs pray for damages in the amount of the value of all oil and gas produced.
Defendants maintain the Cockrell Well was drilled on the batture, alluvion or accretion in front of property owned by the Zenor family, impleaded as defendants by the amended petition hereinbefore mentioned. In essence, defendants contend the navigable body of water known as Six Mile Lake is a river or stream within the meaning of the term river or stream as used in LSA-C.C. Article 509 which in effect provides that owners of lands adjoining rivers or streams are entitled to the accretions which are formed successively and imperceptibly and form alluvion attached to the shore. Anticipating that plaintiffs might alternatively rely upon the provisions of Act 341 of 1952 (LSA-R.S. 9:1151), which will be hereinafter discussed, defendants filed a special plea asserting the unconstitutionality of that statute.
In a well written opinion which clearly reflects painstaking consideration was given the various issues raised by appellants, our esteemed colleague rendered judgment herein rejecting plaintiffs' demands and in favor of defendants declaring defendants to be the owners of the disputed property. From said unfavorable decision plaintiffs have appealed.
The contentions made by appellants on this appeal may be summarized as follows:
1. The land on which the well in question is situated is in fact the bed or bottom of Six Mile Lake, a body of water navigable at the time of the State's admission to the union in 1812, and consequently the property of the state by virtue of its inherent sovereignty, which title, thusly acquired, has never been alienated.
2. Six Mile Lake was a true lake, as distinguished from a river or stream, at the time of the state's admission to the union, therefore, under the law and jurisprudence *364 of this state Article 509, LSA-C.C. has no application.
3. Alternatively, if Article 509, LSA-C.C. is found to be applicable herein, the land in controversy is not alluvion in that it was not formed successively and imperceptibly outward from the shore but rather is an island formed several hundred feet from and unattached to the shore.
4. In the further alternative, assuming the body of water in question to be a river or stream as distinguished from a lake, Article 509, LSA-C.C. is without application because the alluvial deposit was not formed in the ordinary course of nature by naturally flowing waters but rather by artificial flow or current created by the intervention of man consisting of the dredging of channels through Six Mile Lake and other bodies of water to the north, all of which form a large body of water known as Grand Lake which, in turn, comprises part of what is known as the Atchafalaya Basin.
5. In the further alternative appellants maintain the batture was formed from spoil hydraulically dredged in the construction of nearby Wax Lake Outlet, which spoil overflowed the general area and was thus deposited by artificial means as distinguished from true alluvion.
6. In the final alternative, plaintiffs claim the oil, gas and mineral deposits underlying the alluvion in question upon the authority of Act 341 of 1952, which provides, in effect, that owners of lands adjoining navigable waters take title to accretions subject to and encumbered with any oil, gas and mineral leases covering such lands. In this regard it is argued the State leased subject property in 1956, prior to the accretion.
It is now well settled jurisprudence that the beds and bottoms of all navigable waters belong to the state by virtue of its inherent sovereignty.
With respect to rivers and streams the bed or bottoms of the water which the state holds in her sovereign capacity is only the land covered by the water at its ordinary low stage. Wemple v. Eastham, 150 La. 247, 90 So. 637; Pizanie v. Gauthreaux, 173 La. 737, 138 So. 650; Seibert v. Conservation Commission of Louisiana, 181 La. 237, 159 So. 375; Esso Standard Oil Company v. Jones, 233 La. 915, 98 So.2d 236. Where there are no levees the banks of rivers and streams, that is to say the land lying between the edge of the water at its ordinary low stage and the line which the water reaches in its ordinary high stage, belongs to the owner of the adjacent land subject to the right of the public to use the bank to land and unload boats and for other purposes provided by law. Wemple v. Eastman, supra, Pizanie v. Gauthreaux, supra.
In the case of lakes the bed or bottom which the state owns in her sovereign capacity is all of the land covered by the water at its ordinary high water stage. State v. Bozeman, 156 La. 635, 101 So. 4.
The laws of this state regarding accretion and dereliction are set forth in LSA-C.C. Articles 509 and 510, which respectively provide as follows:
"Art. 509. Alluvion, accession to landowner
"The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion.
"The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or stream, and whether the same be navigable or *365 not, who is bound to leave public that portion of the bank which is required by law for the public use."
"Art. 510. Dereliction, accession to landowner
"The same rule applies to derelictions formed by running water retiring imperceptibly from one of its shores and encroaching on the other; the owner of the land, adjoining the shore which is left dry, has a right to the dereliction, nor can the owner of the opposite shore, claim the land which he has lost.
"This right does not take place in case of derelictions of the sea."
In the landmark case of Zeller v. Southern Yacht Club, 34 La.Ann. 837, it was decided the provisions of Article 509 regarding ownership of lands formed by accretion apply only to alluvial deposits on rivers and running streams and not to lakes, arms of the sea or other large bodies of water. The jurisprudence thus established has been consistently followed in numerous subsequent cases. Miami Corporation v. State, 186 La. 784, 173 So. 315; Amerada Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So.2d 61; Esso Standard Oil Company v. Jones, 233 La. 915, 98 So.2d 236.
The rationale of the rule granting to the riparian owner title to all alluvial deposits which attach to his land as the result of silt or deposits carried by rivers and running streams is the equitable principle that he whose property is subject to depredation, inundation or destruction by the forces of nature in the form of currents present in rivers and streams must be accorded the benefits or advantages which such forces bestow in the form of additions to his property when such fortuitous event occurs. Amerada Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So. 2d 61, and authorities therein cited.
While the litigants presently before the court concede the correctness of the foregoing pronouncements, it is the contention of appellants that Article 509, LSA-C.C. is inapplicable herein for the reason that Six Mile Lake is neither a river or stream but a true lake and therefore the rules of accretion and dereliction are without application as held in Zeller v. Southern Yacht Club, supra. Appellees maintain, however, Six Mile Lake is in fact a stream within the meaning and intendment of the term "other stream" as utilized in Article 509 consequently said article governs the case at bar.
Plaintiffs' contention that the body of water in question is a lake as distinguished from a river or stream is predicated upon the decision in State v. Erwin, 173 La. 507, 138 So. 84, decided in 1931, by a divided Supreme Court. In the Erwin case, supra, the court was called upon to decide title to a strip of land once above water but then submerged beneath the surface of a body of water known as Calcasieu Lake, having been washed away by wave action in the lake. Predicated upon Zeller v. Southern Yacht Club, supra, the court properly held Articles 509 and 510 have no application to lakes. The court, however, held that Calcasieu Lake was in fact a lake and not a river or stream despite the fact the waters of the Calcasieu River emptied into Calcasieu Lake through Mud Lake at its northern end and left the lake at its southern end on the river's way to the Gulf of Mexico. The court therein acknowledged that under French law, from which our code is largely taken, Calcasieu Lake would probably be considered a mere expansion of the Calcasieu River and the entire lake, therefore, considered a section of the river, because under French law a lake through which a river flows, though called a lake, is deemed a river in the application of the laws governing alluvion and dereliction. The court in the Erwin case, however, held that the better view, without citing authority or principle in support thereof, is to regard vast expanses of *366 water, such as Calcasieu Lake, as a lake notwithstanding a river empties into it and flows through it into the sea. The court also held that since the body of water in question was a navigable lake at the time the state entered the union in 1812, the state owned the bed up to the high water mark as such water existed in 1812 but that the adjoining owner retained title to the original high water mark notwithstanding a portion thereof was subsequently submerged by natural causes. The court remanded the case so that the original high water mark could be established.
Defendants maintain the rule of the Erwin case, supra, is no longer the law of this state, said decision having been overruled by subsequent authorities, namely, Miami Corporation v. State, 186 La. 784, 173 So. 315; Amerada Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So.2d 61; Amerada Petroleum Corporation v. Case, 210 La. 630, 27 So.2d 431, and Esso Standard Oil Company v. Jones, 233 La. 915, 98 So.2d 236, which in effect held that a body of water through which a current flows with sufficient velocity to erode land, carry silt and form alluvion, though called a lake, is a river or "other stream" within the meaning of those terms as they appear in Articles 509 and 510 of LSA-C.C. Defendant maintains the record shows Six Mile Lake is a stream with flowing water sufficient in velocity to carry silt and deposits and therefore comes within the rule of the cited authorities.
In the Miami case, supra, the court had under consideration the question of ownership of submerged lands along the shore of Grand Lake, Cameron Parish. The state therein resisted plaintiff's claim of ownership to the disputed area on the ground that since the body of water involved was navigable at the time the state entered the union the bed thereof, including any portion thereof subsequently formed, belonged to the state pursuant to those articles of the Civil Code which provide that public things include beds of navigable rivers as long as they are covered by waters. The same identical issue was involved in the Miami case as was presented in State v. Erwin, supra. In the Miami case, however, the court painstakingly set forth the reasons why it did not consider the Erwin case controlling under the rule of stare decisis, and held title to the submerged area was in the state. In speaking of the Erwin case, the Miami case noted the former decision was predicated on the ground that the provisions of Articles 509 and 510 LSA-C.C. do not apply to fresh water lakes but that in order to reach the result it did, the court in the Erwin case went counter to the long established principle that the beds and bottoms of all navigable waters belong to the state. The court in Miami Corporation v. State then proceeded to review the reasons of public policy which make private ownership of the beds and bottoms of navigable waterways undesirable and based its decision solely on the latter considerations.
We agree with learned counsel for appellees that the rule of State v. Erwin, as respects the definition of a lake as distinguished from a river or stream, appears to have been clearly overruled by subsequent authority, primarily, Amerada Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So.2d 61, and Esso Standard Oil Company v. Jones, 233 La. 915, 98 So. 2d 236.
In the Amerada Petroleum case, supra, which will sometimes hereinafter be referred to as First Amerada to distinguish it from the subsequent decision of Amerada Petroleum Corporation v. Case, 210 La. 630, 27 So.2d 431, which dealt with accretion formed along the shore of the Arm of Grand Lake (which incidentally lies to the north of and empties into the Grand Lake with which we are herein presently concerned), the Court held the body of water concerned to be a stream to which the provisions of Article 509 apply and, on that finding, awarded title to the disputed land to the riparian owner, rejecting the state's claim of title thereto. The case *367 was submitted on an agreed statement of facts which showed the land in controversy was gradually and imperceptibly formed by silt or accretion brought down by the waters of the upper Atchafalaya River through Bayou Nimrod and Chicot Pass which at times flowed along the shore line of Section 31, T. 11 S., R. 10 E., St. Martin Parish, in front of which property the alluvion collected. In concluding the Arm of Grand Lake was in fact a stream as distinguished from a lake, the court cited at length the well reasoned opinion of the trial court which stated the outcome of the controversy hinged upon the determination of whether the body of water involved was a lake, to which Articles 509 and 510 do not apply upon authority of Zeller v. Southern Yacht Club, supra, or whether it was in fact a river or stream to which accretion applies under the provisions of Article 509. It seems crystal clear the court therein adopted the definition of a lake as a body of water which is more or less stagnant and in which the water is supplied from drainage. The court conceded the definition of a lake as adopted therein contemplates a probable rise of water level during the rainy season sufficient to produce a current but that such occurrence would not alter the character of a body of water as a lake so long as it was primarily a body of still water fed mainly by drainage. The opinion further recognizes a river is distinguished from a lake in that it flows, more or less in a permanent bed or channel between well defined banks, with a current. The opinion then distinguishes a river from a stream in that the latter, though flowing, does not possess the well defined walls and banks of a river and next differentiates a stream from a lake in that the waters of a stream are not still and dead and are not supplied by drainage.
The court then concluded Article 509 to be applicable to any body of water containing moving waters having the capacity of forming accretions. The court reasoned the rule had to be so because of the manifest inequity of subjecting riparian owners to the risk of losing property by the eroding effects of moving waters without affording the benefit of any accretion or alluvial deposits which might attach to their property by the same natural force. In substance the court held that while the arm of Grand Lake in question was not a river, neither was it a lake but rather it fell into the category of "other stream" as the term appears in Article 509. We note in First Amerada the following appropriate language.
"It will be noted, from an examination of the quoted portion of his opinion, the trial judge holds that the body of water known as the arm of Grand Lake can not be classified as a river, because it does not possess well defined banks or walls as are required of rivers, and, on the other hand, that it can not be classified as a lake, because its waters are not still or dead and they are not supplied from drainage as is required of lakes. However, his holding is that the arm of Grand Lake is a body of flowing water, and therefore it constitutes a stream within the meaning of the term, `or other stream' referred to in Article 509 of the Civil Code. He reasons very logically that the `other stream' referred to in the article includes streams falling into the category of rivers. This inclusion covers the case here, because the stream involved possesses all the characteristics of a river in its ability to remove and deposit the soil.
"The trial judge was correct in holding that the body of water known as the arm of Grand Lake is a stream with running water. It may be that he did not go far enough in holding that because it did not have well defined banks it was not a river, although, with this exception, it possesses all the characteristics of a river. In his holding, the trial judge overlooked the admission of the State, as contained in paragraph 6 of the agreed statement of facts, that the stream in question *368 flowed between banks and its width between the banks at two separate and distinct points are given.
"The arm of Grand Lake is not and has never been stagnant, but has always consisted of running water. It is unmistakably a part of Atchafalaya River by which its waters are solely supplied. It is not subject to the ebb and flow of the tide and through it the waters of the Atchafalaya River run to again form a distinct river at the Town of Patterson before reaching the gulf."
In Esso Standard Oil Company v. Jones, supra, the rule of First Amerada was in effect applied to a horseshoe shaped segment of the Mississippi River known as Deer Park Bend, which became cut off from the main river channel by the construction of a new channel known as Glascock Cut-Off Channel across the mouth of the horseshoe. The court therein applied the rule of First Amerada and held that since the waters of Deer Park Bend contained currents of sufficient capacity to carry alluvial material, Deer Park Bend was a stream and not a lake. The following pertinent observations of the trial court were approvingly cited by the Supreme Court in the Jones case:
"`"Therefore, I can put no other construction on the inclusion of `other streams' under the cited Article, than the one herein given, for we might very well ask ourselves the question, what streams would the lawmakers have reference to? In my opinion there is but one answer to this question, and it is: All streams whose water have the power to form accretions: and as the stream with which we are herein concerned has the power to form accretions, as it has done, it is then plain to me that it falls within the category of the streams mentioned in the cited article, and therefore, all accretions forming to its shores or banks belonging to the abutting property owners."'
* * * * * *
"In the present case at the present time there is not a constant or continuous flow at low water around the bendway every day in every year, but definitely the bendway is not a lake. When it does flow it is not drainage and the bendway gets its water from the main body of the Mississippi River. A stream is not required to flow every minute of the time. In this case the bendway is characterized by definite banks on each side, a definite bed, a natural current always downstream with the main body of the Mississippi River being the source of water supply. The current is capable of carrying alluvion and of depositing it along the banks. These characteristics fulfill every possible requirement of a stream and prevent the Deer Park Bend channel from being classified as a lake or pond up to this time. That location may change some time in the future becoming a dead lake, but it has not done so at this writing."
We conclude, therefore, the rule of the Erwin case, insofar as it holds a body of water called a lake, through which water runs and flows with sufficient capacity and velocity to carry alluvion, is nevertheless a lake to which the provisions of Articles 509 and 510, LSA-C.C. do not apply, has to that extent been overruled by the cited decisions of the Supreme Court. We further hold that a body of water through which a current flows or runs with such capacity and velocity and power as to form accretions, is characterized as a river or stream, depending upon all attending circumstances, for the purpose of applying the rules of accretion and dereliction set forth in Articles 509 and 510, LSA-C.C.
Appellees concede that if Six Mile Lake is in fact a lake, as distinguished from a river or stream, appellants are entitled to judgment for the reason that Article 509, LSA-C.C. admittedly is not applicable to a true lake. In view of said acknowledgment we shall proceed to dispose of said issue at this juncture. Another aspect of *369 this same question is appellants' contention. Article 509, LSA-C.C. is nevertheless inapplicable because Six Mile Lake was not a stream at the time of the state's admission to the union and the Article in question applies only to those bodies of water which were rivers or streams in 1812.
The evidence reflects Six Mile Lake, a part of the Atchafalaya River System, is situated on the southeast end of a large body of water known as Grand Lake. It further appears that Grand Lake together with the Arm of Grand Lake which latter water body enters Grand Lake at the Northeast corner of Grand Lake, Lake Fausse Point which enters Grand Lake at its Northwest corner, Six Mile Lake and certain other connected water bodies were, in ancient times, collectively known as Lake Chetimache. It is undisputed that from time immemorial the Atchafalaya River System, of which Six Mile Lake is a segment, has served to carry the waters of the Ouachita River, Red River and at least a portion of the waters of the Mississippi River southward to the Gulf of Mexico. In the portion of the Atchafalaya Basin where Six Mile Lake is situated the Atchafalaya River consisted of numerous meandering channels flowing through a network of smaller waterways and joined by a host of smaller tributaries all of which unite with the main body of water at Lake Chicot, Lake Fausse Pointe, Grand Lake proper and Six Mile Lake, eventually flowing through Berwick Bay into the lower Atchafalaya and from thence into the Gulf of Mexico.
To establish the nature of Six Mile Lake, which is approximately three miles wide at Barnett's Cove, the site of the accretion in question, defendants offered the testimony of Professor Reinhard A. Steinmayer, who organized the Department of Geology at Tulane University in 1922, and retired as head of that department in 1957. On numerous occasions he has qualified as an expert witness in litigation involving coastal areas of the State of Louisiana. Predicated upon historical maps, records and documents, both antedating and postdating the state's admission into the union, and personal examination of the waterway, its bottom and surrounding vegetation, Dr. Steinmayer was of the opinion Six Mile Lake was a stream prior to 1812 and has continued as such until the present time. His research disclosed the body of water in question has traditionally and historically possessed a sinuousity characteristic of a stream of flowing or running water and a changing sinuous bank line not found in lakes or bodies of still water. Dr. Steinmayer's studies and personal observations disclosed an absence of lacustrine features. He found, however, a great volume of water flowing through the waterway, 380,000 cubic feet per second at Cypress Island, which is at the head of Six Mile Lake and 500,000 cubic feet per second in Six Mile Lake itself. Based on studies made September 1, 1959, Dr. Steinmayer found both medial (channel) and littoral (bank or shore) currents. Using accepted measuring procedure, he measured current velocities in several places and found an average medial current of 1.55 miles per hour and average littoral current at the rate of .68 miles per hour as compared with Mississippi River medial current of 1.0 miles per hour. Observation and examination including more than 50 borings or core tests disclosed, inter alia, sedimentary deposits in the form of streamlined almond shaped alluvial fans with elongated axes pointing downstream as is to be expected of such fans found in running or flowing water. Cross bedding and stratification disclosed by the borings taken were deemed the result of current changes and further confirmed the sinuousity of the stream in the opinion of Dr. Steinmayer. Such conditions, he further observed, were not found in lakes but only in bodies of running water. The alluvial fans located north of the well site were found to have a higher elevation than those formed downstream evidencing an approximate slope of .67 feet per mile. His search also disclosed an absence of peat deposits which are usually found in lakes.
*370 Dr. Steinmayer made a careful examination to determine whether the small streams entering the northerly and northeasterly portions of the "lake segment", of which Six Mile Lake is a part, deposited their materials at their mouths, but he found no such deposits. He explained that if the lake segment were a lake such deposits should have been found at the mouths of the small streams entering from the north. He further explained that in the case of a stream as distinguished from a lake, the materials from the smaller streams are picked up by the littoral or shore currents and carried downstream so that deposits do not build up at their mouths.
Other characteristics which Dr. Steinmayer found which were typical of a stream rather than a lake were the presence of a thalweg or channel and the present and historical sinuous and elongated shape of the water body. The lakes which he studied in the Louisiana coastal region all have a typical saucer-shaped basin whereas both Grand Lake and Six Mile Lake have V-shaped sections characteristic of a body of running water.
Dr. Steinmayer also gave the following testimony regarding waves which are characteristic of lakes:
"A. Waves. And there are generally two types of waves, waves of oscillation and waves of translation. In waves of oscillation, the particles move up and down with little or no forward advance, while in waves of translation, the particles move forward. Now, when an oscillatory wave beats against the shoreline, with water of sufficient depth, it brings about erosion of the shoreline, and we find cliffs, headlands, and features that have been eroded by the pounding action of the oscillatory waves on the shoreline.
"On the other hand, if the water is shallow, the oscillatory waves break some distance from the shoreline becoming waves of translation. The waves of translation, then, they strike the shoreline obliquely and are resolved into two principal components, named littoral currents or shore currents and undertow. It is the littoral or shore current that brings about or transports particles and I made a particular search to find, to see if there were spits or bars or any features that would be developed by littoral currents and I could not find any such features."
He examined the area very carefully and particularly on the edges of Cypress Island (an island between Grand Lake proper and Six Mile Lake) where erosion produced by oscillatory wave action should have been found if any were present, but he found no such action. Dr. Steinmayer further testified wave action generally produces beaches which are absent in Six Mile Lake. Conceding that there are some areas along the shore of Six Mile Lake referred to as beaches, namely, Charenton Beach, and others, he explained these were not in fact true beaches in the sense they had been produced by the natural action of waves. Examination of vegetal commune revealed the presence of material similar to that found throughout the Atchafalaya Basin and identical to that found by Deputy Surveyor Fields in 1837. Also, according to Dr. Steinmayer, if such deposits were present in 1837, when Fields made his survey, they undoubtedly were present in 1812.
There appears in the record an ancient work known as Darby's Journal, published in 1816, which is based on the writer's observation of the Atchafalaya Basin in the years 1808 through 1810. It states that "the rapidity of the current of the Atchafalaya and the quantity drawn by its efflux from the Mississippi is almost inconceivable." Regarding the Mississippi River, Darby's Journal states, "but as if proud in the majesty of strength, this mighty stream no sooner receives this great accession of *371 force, than it discharges the auxillary waters into the Atchafalaya," and "the numberous (sic) outlets between the efflux of the Atchafalaya and the Lafourche contribute to and argument the Atchafalaya."
Also of record is the written report accompanying Graham's Map which map is dated 1829. The accompanying report states that "about eighty-eight miles above Manchac, and just below the 31st degree of latitude is the Chafalaya. This is one of the ancient channels of the Mississippi River, and being very deep carries off at all times great quantities of water."
It is to be further noted that Darby's Journal states "that a general error has prevailed that the raft or body of timber that choaks (sic) this river impedes the issue of water from the Mississippi. * * * The distance from the Mississippi to the head of the raft is twenty-seven miles, and the current of the Atchafalaya extremely rapid. But the inclination of the plane along which the Atchafalaya Runs and the irresistible impetus given to the stream by the peculiar assemblage of waters at its efflux; this river suffers no diminution by the raft."
In his journal dated 1818, Cathcart wrote that he found Lake Chetimaches to have a channel 4½ fathoms deep with a current of one mile per hour. Dr. Steinmayer concluded from this that if such a channel existed at that time it undoubtedly existed in 1812 as a channel of such nature could not develop overnight.
We believe the foregoing circumstances refutes appellants' contention that the Atchafalaya River did not flow through the Grand Lake-Six Mile Lake segment of the Atchafalaya Basin in 1812 but rather that it flowed east thereof. The conclusion reached is further corroborated by the following conclusion reached by the Supreme Court in Amerada Petroleum Corporation v. State Mineral Board, 1943, 203 La. 473, 14 So.2d 61:
"* * * They state that the Atchafalaya River flowed around Grand Lake and the area of the arm of Grand Lake. They argue that the statement is borne out by the map of Lafon, dated in 1806, which is in evidence, marked Exhibit State 7. The Lafon map, however, is at variance with all other state maps and, hence, it is evidently erroneous and was never made from any actual survey.
"There is also in evidence State Exhibit No. 8, a map `from actual survey' by William Darby, endorsed `Entered according to Act of Congress the 8th day of April, 1816, by William Darby'. This map and the Lafon map were made about the same time and no material changes in topography could have taken place.
"The Darby map is one of the best known old maps of Louisiana and has been introduced in evidence in several law suits. A comparison with the more recent maps in evidence will prove that, considering the conditions under which Darby worked, his map is remarkably accurate.
* * * * * *
"Darby's map shows a large lake called Lake Chetimaches. Lake Round, Lake Fausse Pointe, Lake Dauterive, Lake Chicot and Six Mile Lake are included in this lake. Several connections are shown between the Atchafalaya River and Lake Chetimaches, not as many as really exist but enough to show that at least since 1812 the Atchafalaya River has broken up at Butte La Rose to flow through many streams and the chain of Lakes to reunite in one stream at Berwick Bay. This amply demonstrates that since 1812 there has been no noticeable diversion of the waters of the Atchafalaya River to Bayou Nimrod, Chicot Pass, or Arm of Grand Lake."
Finally, Dr. Steinmayer testified there are and had been banks or natural levees, along the Grand Lake-Six Mile Lake watercourse, although they had been largely *372 obliterated by the acts of man. His testimony in this regard is corroborated by the Cathcart Journal.
Professor John P. McDowell, Geologist, Assistant Professor of Geology, Tulane University, whose specialty is sedimentation, was educated at Yale University, Dartmouth College (M. A. Degree), and John Hopkins University where he completed all requirements for a Ph. D. degree except the final submission of his thesis. In addition, Professor McDowell has studied field geology and aerial photograph interpretation at Massachusetts Institute of Technology. At Dartmouth he took courses in geomorphology (the study of land forms and their development) and aerial photography. He has worked as a geologist for the United States Government, and has had several years teaching experience. He presently teaches sedimentation at Tulane University.
Calculations made by Professor McDowell revealed the stream slope in the Grand Lake-Six Mile Lake area to be greater than the stream slope of the Mississippi River from Old River to Head of Passes. As did Dr. Steinmayer, Professor McDowell found a thalweg and a strong current in Six Mile Lake. He also observed the accretions were streamlined by the current. Instead of finding sediment in the deepest portion as was to be expected in the case of lakes, he noted the sediment thinned toward the thalweg which circumstance is characteristic of a body of running water. He found no true beaches which would normally be present in a lake. His examination also revealed evidence of stratification of deposits which indicated said deposits were alluvial in nature. Professor McDowell further noted the cross-stratification and cross-bedding observed by Dr. Steinmayer. In his opinion such circumstance is a phenomenon produced by currents and therefore not found in a lake or body of still water.
Plaintiffs called as a witness Leo Odom, Civil Engineer who has been in the employ of the United States Corps of Engineers since 1940. In substance Mr. Odom testified that although Six Mile Lake is a segment of the Atchafalaya Basin, it was in fact a lake and not a stream in 1812. His opinion in this regard is predicated upon his study of ancient documents and personal knowledge gained in his experience with the United States Engineers. He contended primarily the body of water in question did not have a flow in 1812 because the presence of a large raft impeded the flow of water in the Atchafalaya System. His testimony in this regard, however, is clearly contrary to the hereinabove quoted excerpt found in Darby's Journal as well as other ancient and historical documents appearing in the record. In short, Mr. Odom contends the area in dispute is a deltaic formation resulting from the hydraulically dredged artificial waterway known as the Wax Lake Outlet situated to the west of the Barnett's Cove Section of Six Mile Lake. According to Mr. Odom, said spoil, which contained huge quantities of water, flowed across the low-lying area and resulted in the build up of the area in dispute. He found some evidence of wave erosion but did not state precisely where. He concedes there was some flow of water through Grand Lake-Six Mile Lake prior to 1941, which flow was materially increased by a channel dug by the United States Corps of Engineers in 1941 along the eastern side of Grand Lake. The increased velocity, thus produced, is admitted to have resulted in considerable sedimentation in Grand Lake and Six Mile Lake.
Dr. Marcus A. Hanna, Geologist, called by appellants, testified he is a Consultant Geologist with a Ph. D. Degree from the University of California. His experience in the field has been extensive including teaching and employment by large oil corporations. His examination of the disputed area included the taking of cores which he personally analyzed. Predicated on the finding that the various strata forming the deposit thickened toward the northern part of what he called the "island" and thinned *373 toward the south or shore, Dr. Hanna concluded the deposit built up towards the shore rather than from the shore outward. In his further opinion the sediment eventually resulted in an emergent sediment body with a channel between what he described as the "high island" to the north and the shore to the south.
We conclude, therefore, Six Mile Lake is a stream as distinguished from a lake considering it is shown to be a body of water containing currents of sufficient velocity to carry alluvial materials. Moreover, the record conclusively shows the flow of water entering Six Mile Lake and causing its currents is not the result of drainage but the natural movement or flow of the waters of the Atchafalaya River passing through the waterway known as the Atchafalaya Basin on its way to the sea. Because the banks of Six Mile Lake are not well defined as in the case of rivers, the body of water in question must be characterized as a stream rather than a river. Technically speaking, Six Mile Lake appears to be a segment of the Atchafalaya River. The record in the case before us leaves not the slightest doubt but that Six Mile Lake does in fact annually carry off a substantial portion of the tremendous volume of water flowing to the sea through the Atchafalaya River. It further appears beyond question, this condition antedated 1812 and has continued to the present time.
It follows, therefore, Six Mile Lake was a stream in 1812 within the meaning and intendment of the term "other stream" as used in Article 509, LSA-C.C., consequently the provisions of said article are applicable to the case at bar as held by the learned trial court. The conclusion reached obviates the necessity of passing upon appellees' contention that LSA-C.C. Article 509 is applicable herein if Six Mile Lake is presently found to be a stream, notwithstanding said body of water may not have been a stream at the time of this state's admission into the union.
There is no support in the record for appellants' contention the land in dispute was man made in that it consists of spoil which was deposited at the well site as a result of hydraulic dredging in the course of constructing nearby Wax Lake Outlet. Nothing in the record indicates spoil was pumped directly to the point of the well site. It is conceded by appellees that a portion of the deposit in question is probably made of spoil resulting from the dredging of Wax Lake Outlet but the evidence clearly preponderates in favor of the conclusion the material in question, as was the remaining material forming the batture involved herein, was carried to the place of deposit by currents. Although some attempt was made by appellants to establish that the spoil from the aforesaid dredging project overflowed the adjacent land and was brought to the site in this manner as distinguished from its being carried by the force of moving water, the evidence does not support this contention. In this regard the evidence shows the strata of material conceded to have originated as spoil from the Wax Lake Outlet operation constitutes only one of several distinctly different strata (eight in number). On this important score, Professor McDowell's cross-sectional charts which show the strata forming the batture indicate that of the eight strata constituting the batture two were laid down prior to that indicated to be made of material similar to the spoil dredged up in the Wax Lake Outlet project. Granting the testimony of Professor McDowell and Dr. Steinmayer is contradicted by that of appellants' experts, we nevertheless conclude, as did the trial court, the evidence preponderates in favor of appellees' contention that the land in question was not deposited in the area as a result of operations conducted in the cutting of the Wax Lake Channel but was in fact carried thereby the currents in Six Mile Lake. Our conclusion in this regard is further supported by the fact that although the dredging of the Wax Lake Outlet Channel was conducted in 1941 or 1942, the batture *374 in question did not emerge from the water at low water stage until approximately 1952. This salient fact appears patently inconsistent with appellants' contention the land in question was deposited in place by dredging operations rather than being carried by the natural force of running or flowing water.
We shall consider now the question of whether the land is alluvion in that it built outward from the shore and is attached thereto as contended by defendants, or whether it is an island which emerged in the water body out from the shore and has extended shoreward but is not attached or connected to the shore as contended by appellants. Appellees concede that if the disputed area is in fact an island unattached to the shore, appellants should prevail upon this appeal.
Here again the testimony between appellants' and appellees' witnesses is in conflict. We have already reviewed the testimony of Dr. Steinmayer and Professor McDowell (appellees' witnesses) and that of appellants' experts, Leo Odom and Dr. Hanna, regarding the characteristics of Six Mile Lake as a lake or stream. Needless to say, their respective testimony has considerable bearing on the vital issue presently under consideration but we shall repeat such testimony only insofar as is necessary to a full understanding of the present discussion.
The property in dispute is located north of the old shore line of property belonging to defendant Zenor which is situated on the south shore of Six Mile Lake on the eastern end of a cove known as Barnett's Cove. It appears that the accretion began in the middle or western portion of Barnett's Cove and that there is presently a small slough between the former shore line and the main body of the accretion where the well site is located. It is undisputed that the batture has its highest elevation on the north towards Six Mile Lake and slopes gradually toward the wooded shore line on the south. Predicated primarily upon these two conceded circumstances, appellants maintain the accretion is an island and therefore the property of the state and secondly, if it is connected to the main shore it is not attached to defendants' property but rather is separated therefrom by the aforementioned slough.
Dr. Willis Eggler, Botanist, called by defendants, is a specialist in plant ecology. He spent a total of three days in the field examining the disputed area. In essence, his testimony is to the effect that his examination of vegetation on the disputed property disclosed two main community types, namely, willows, which occupied approximately 15 per cent of the area, and a saggittaria herbaceous type plant which dominated the remaining area. He stated the width of the leaves of such plants usually indicated whether they grew out of water. According to Dr. Eggler, the growing season of the saggittaria is late spring and early summer. He explained that if the plant has a wide leaf or broad leaf blades it indicates most of its growth was out of water whereas if the plant has a typically narrow and shorter leaf, without blade, it indicated it was submerged during most of its growth. In short, he testified his examination of the plants disclosed most possessed of wide leaves with broad blades indicated their growth was primarily out of water.
Dr. Joseph Ewan, Botanist, called on behalf of appellants, testified he is Professor of Botany at Tulane University. He visited the area on two occasions, each time riding around what appellants called the "island", in a boat powered by an outboard motor. Predicated upon his tests and examinations he concluded the "island" built up in the water and first emerged a considerable distance from the shore. He is of the opinion that whereas the "island" has grown toward the shore, it has not in fact reached the shore or actually connected to the land.
At this juncture we deem it necessary to reiterate the testimony of Professor McDowell and Dr. Steinmayer to the effect *375 that their examinations in each of the eight strata noted built up and were thickest at the shore and thinned toward the thalweg or channel of the stream. As previously noted Dr. Steinmayer is contradicted in this regard by Dr. Hanna. It is significant to note, however, several lay witnesses called by defendants testified they walked across the entire batture into the woods commencing in about the year 1951 or 1952. Certain game wardens called by defendants testified they walked across the batture in pursuit of game violators who eluded capture by escaping on foot across the batture into the woods adjoining the former shore line.
The phenomenon of the high northern elevation and the slough to the south of the so-called "island" was accounted for by Dr. McDowell who explained that the strata which were successively laid down by the action of stream currents to make the batture, slope from the shore northerly toward the channel or thalweg, particularly those which were laid down first. As each stratum was deposited closer to the surface of the water the deposits tended to become more level. The greater build up on the northern or outer extremity of the batture resulted from the fact that as the water became progressively more shallow the current became weaker thus losing proportionally its silt carrying power and ability to make deposits. Eventually when the accretion began to emerge from the water at low water stages, the only significant growth occurred on the outer portions which were nearest deposit-bearing currents during periods of high water. It is significant to note, in addition, that the differences in elevation are relatively small and the entire area is rather muddy and marshy most of the time. Furthermore, the slough to which appellants allude is revealed by photographic evidence as merely a low place with cypress trees growing therein. We conclude the accretion is batture built up from the shore or land outward toward the channel of the stream and is connected and attached to the Zenor property.
We shall next consider appellants' contention the batture in question is below ordinary low water and therefore insusceptible of private ownership inasmuch as it constitutes the bed or bottom of a body of navigable water. In this regard appellees concede that if the batture lies below the ordinary low water mark judgment herein should be in favor of appellants. However, appellees vigorously maintain the batture extends above the ordinary low water mark therefore the judgment of the lower court in favor of appellees should be sustained.
On this most vital issue we deem it important to first note that the official files of the United States Corps of Engineers (introduced in evidence as Exhibit D-31) show the mean low water mark at the well site in question to be minus 0.05 feet Mean Sea Level, sometimes hereinafter expressed as MSL.
Defendants' expert, Whitaker, computed the mean low water level or ordinary low water stage at the site in question according to both formulae employed in Seibert v. Conservation Commission of Louisiana, 181 La. 237, 159 So. 375. Using the United States Government daily recorded water stages for the years 1933-1958, he determined the lowest depth to which the water receded in each of said years, computed the average of said annual lows and thus arrived at a mean low water level of minus 1.29 at the government Verdunville gauge located approximately 1½ miles upstream from the batture in question. Making allowance for the stipulated stream slope, he determined the low water mark at the well site to be minus 1.44 MSL, that is to say 1.44 feet below MSL. Whitaker next determined the low water season for each of the same years and, taking the daily low at the Verdunville gauge during such seasons, arrived at a low water stage for the Verdunville gauge. Again making allowance for the stream slope he determined the low water stage at the well site to be minus 0.05 feet MSL or 0.05 feet below Mean Sea Level, which figure coincides *376 with the aforesaid mean low water mark for the site indicated on the files and records of the United States Corps of Engineers.
Mr. Odom, appellants' expert, used three approaches to determine the ordinary low water mark at the Cockrell Well site.
In the first approach he considered the daily low readings at Verdunville from 1940 to 1958, eliminating from consideration the period from February through June of each year. In this manner he arrived at an average daily low of +.75 feet MSL from which he subtracted the stipulated average difference in level between the Verdunville and Cockrell Well gauges of .15 feet. The result was a Mean Low Water level of +.6 feet MSL. This method is objectionable in that it considers only the seven-month period of each year remaining after Odom's elemination of the five-month period in which, according to Mr. Odom, the high flows are entering Grand Lake from the upper Atchafalaya. There is nothing in the record to indicate that the low water season at Six Mile Lake lasted seven months every year or an average of seven months during the period under consideration or that the low water season occurred at the same time each year. Every approach used by Odom is similarly objectionable inasmuch as all of his computations are based on the same months during the periods covered.
In Mr. Odom's second approach, he computed the stream slope between the Verdunville and Cockrell Well gauges, by dividing the distance between the two points into the stipulated average difference in readings of .15 feet thus obtaining the stream slope of .043 feet per mile. (This figure will be referred to hereinafter as the "V-CW slope.") Mr. Odom concedes the accuracy of this figure depends upon the accuracy of the measurement between the two gauges. Our review of the evidence reveals the record casts serious doubt upon this point. Mr. Odom then multiplied the "V-CW slope" times 30 miles, which he took as the distance between the Verdunville gauge and the mouth of the Atchafalaya River, to obtain the average difference in water level of these two points. This figure, which will be referred to hereinafter as the "V-A difference," is 1.29 feet. He admitted the stream slope from Verdunville to the mouth of the Atchafalaya River is variable, not constant, and there is nothing in his testimony to justify the application of the "V-CW slope" to this segment of the lower Atchafalaya.
The next step of Mr. Odom's second approach was to halve the tidal range of 1.4 feet at Pointe au Fer Island, as reported in the Atchafalaya River studies, thus deriving the Mean High Tide (hereinafter called "MHT") referred to Mean Sea Level of +.7 feet. (Mean Low Tide would be -.7 feet) It is assumed that the mean water level at Pointe au Fer Island is normally at Mean Sea Level. (Mean Low Gulf is -.78 feet MSL, but the record does not indicate whether the mean level of the Gulf is equal to Mean Sea Level.) Mr. Odom then added the "MHT" of +.7 to the "V-A difference" of 1.29 to get the Mean High Water stage (hereinafter called "MHW") of +1.99 feet MSL at the Verdunville gauge. Subtracting the average daily tidal variation or range of 1.17 feet at the Verdunville gauge (obtained by averaging the daily variations during the same "low water months" selected in the same manner as in his first approach over the same 19-year period), he arrived at a Mean Low Water level of +.82 feet MSL. Although he did not so testify, we assume Mr. Odom would subtract the stipulated .15 feet from this Verdunville Mean Low Water Level to get the Mean Low Water Level at the Cockrell Wellthus, +.67 feet MSL. It was brought out in cross-examination that the mouth of the Atchafalaya River to which the distance used to compute the "V-A difference" is measured, is actually about ten miles from Pointe au Fer Island where the readings upon which the "MHT" is based were obtained.
*377 Thus we have an inaccurate distance between the two gauges used to obtain a stream slope arbitrarily applied to a segment of the river of an unknown but unconstant or variable slope and arbitrarily added to the mean high tide at a point ten miles distant from that segment.
Assuming that this computation had been made with accurate and relevant data, it would nevertheless remain objectionable, because it is based upon daily tidal variations both at Verdunville and at Pointe au Fer, without regard to changes in low and high water levels within the seven-month period or to variations occurring in cycles of more than a single day, thus virtually eliminating from consideration the effects upon water levels of any factor except tidal action.
The third approach Mr. Odom used was to obtain elevations along the meander line drawn by Fields in 1837 (which according to Mr. Odom was drawn pursuant to instructions to follow the Mean High Water level) from quadrangle maps prepared over a century later. (Mr. Odom conceded that in 100 years the elevations could have changed by erosion, subsidence, build-up and deposition of organic materials). He arrived at a figure of +1.7 feet MSL. From this he subtracted the daily tidal variation at Verdunville of 1.17 (rounded to 1.2) and got a Mean Low Water level of +0.5 feet MSL at the Cockrell Well. Mr. Odom admitted that a meander line is only a general outline of the banks. Assuming the elevations along the meander line correctly represent the Mean High Water Level, the obvious fact remains that an average daily variation computed during a so-called low water seven-month season is totally unrelated to the Mean High Water Level which must have been computed during periods of high water levels which Mr. Odom eliminated at the outset.
Furthermore, the average daily variation of 1.17 or 1.2 feet represents tidal variations occurring within each day. The difference between Mean High Water Level and Mean Low Water Level is not a daily cycle but a seasonal cycle.
Surveys showing land elevations of the area in dispute were determined by the experts presented on behalf of both plaintiffs and defendants as evidenced by elaborate exhibits D-12 and D-62 introduced on behalf of defendants and P-132 offered in support of plaintiff's position. These exhibits show that all land elevations in the area involved, with the exception of a narrow inlet appearing at the extreme eastern end of the batture, are all expressed in plus sea level values. It is of considerable importance that on exhibit D-12, a hydrographic survey of the United States Corps of Engineers made during June 1952, the elevations covering the larger portion of the entire batture including the marginal area where it attaches to the bank of the Zenor property were also all expressed in plus mean sea level values. It is of further significance that the values expressed on plaintiffs' exhibit P-132 correspond very closely with those designated on defendants' offering D-62.
Predicated upon Whitaker's computations of mean low water which appear to us to be the more logically determined, the batture in question is clearly above ordinary mean low water as determined by either formula employed by said expert. We do not wish, however, to base our determination of this issue solely upon the testimony of Whitaker even though it appears more logical and seems to rest on sounder engineering principles. Nor do we elect to determine herein which, if either, of the formula employed, should be adopted by the Courts as the criterion in disposing of the issue presented. It suffices to say, we believe, that Whitaker's testimony, which appears more logical, is corroborated by the preponderance of lay testimony hereinafter discussed and upon which the courts are prone to rely in matters of this character.
Our careful consideration of the Seibert case, supra, however, discloses that therein the Court did not expressly approve or *378 rely upon either the formula utilized by plaintiff or that employed by defendant. On the contrary, it appears the court after explaining each formula, opined that under plaintiff's theory the disputed area would be considered alluvion or batture whereas if defendant's theory were accepted it would be considered a bed of the Mississippi River. Acknowledging it was thus presented with a confusing and complex issue, the court elected to resort to the lay testimony stating that such evidence appears to have been used in determining the issue as presented in all previous litigation of like nature.
From the record it appears the ordinary low water stage occurs during the fall and winter months. Elton J. Mire, a resident of Franklin, Louisiana, employed by Humble Oil & Refining Company, testified he was familiar with the area because of his having hunted there commencing with the 1953 season. Annually since that time he has observed the entire batture completely out of the water, as he expressed it "I mean dry, no water at all." Mire did not build duck blinds on the batture area in the winter because the batture was then dry and the blinds would have been useless. He stated that between November and January, the entire area would be completely out of water for three or four days at a time. He admitted walking across the batture would have been a little difficult but knew it could be done because he had seen footprints leading all the way to the willows growing along the original shoreline.
Norman Buck, merchant and employee of Humble Oil and Refining Company, a resident of Calumet, Louisiana, testified he was familiar with the Barnett's Cove area as a result of frequent hunting activities indulged in annually from 1952 to 1958. He stated that during the hunting season, the area in question would sometimes get "as dry as this floor" alluding to the courtroom floor. Buck further stated that although he had no reason to walk across the entire batture he had on occasion walked out onto that part nearest the "original bank" to get ducks he had killed. Buck acknowledged the batture was a little muddy but explained that he had no particular difficulty in walking out, retrieving his game and returning to his boat.
Tom C. Carr, Esso Standard Petroleum Products Bulk Distributor from Franklin, Louisiana, stated he had been familiar with the area since 1945. In 1955, approximately 15 days prior to opening of the duck season he went to the Barnett's Cove area to construct duck blinds but did not enter the area as it was then out of water. He noted that at this time the batture was above water all the way to the shore and observed "duck potatoes" (that is, saggittaria) growing on the batture all the way to the original shore.
Ralph Mendoza, a towboat operator on Six Mile Lake since 1942, testified his regular route in towing logs to mill carried him near the area in question. During the period 1942-1950, he did not observe any deposits emerging above the water at Barnett's Cove. In 1952, however, he first noted the emerged area which was then a mud flat extending above the water. In 1954, he set traps in the area during the trapping season, using a pirogue for that purpose. Upon returning four or five days later to run his traps, he was unable to reach them because the area was dry and his pirogue would not float. Subsequently, in 1957, Mendoza returned to the area in late July or August to catch bait and found the whole area dry from Barnett's Cove northward all the way to the willow trees at the outer extremity of the batture. Mendoza further testified that this was in summer when the water stage is normally higher than in late fall and winter.
John M. Migeot, a boat contractor-operator engaged by the United States Government, stated he hunted in the Barnett's Cove area during the period 1951-1959, excluding only the years 1957 and 1958. Migeot testified he had seen the entire batture exposed above water all the way to the wood line on the original shore. Granting *379 he had no occasion to walk across the batture, he stated, however, he had seen footprints leading all the way across the batture into the woods ashore.
Theodore Bonin of Avery Island, Louisiana, employed by the State Department of Wildlife and Fisheries in the capacity of Wild Life Agent and Deputy Game Warden, testified he was familiar with the area since 1953, by virtue of his said employment. He stated that most of the time during the hunting season the area is out of water. According to Bonin he walked across the entire batture from the outside edge all the way into the swamp and from the swamp to the outer limits. On December 6, 7 and 8, 1956, he was working in the area because there was a large concentration of ducks present at that time. During this period he was unable to arrest a single violator because they eluded capture by walking across the batture and escaping into the woods and trees in the adjoining swamp.
Everett Fouquier of Franklin, Louisiana, Deputy Sheriff of St. Mary Parish at the time of the trial, but engaged as a game warden from 1953 until 1958, in essence confirmed Bonin's testimony explaining that he occasionally worked with Bonin as a team.
Plaintiffs called as a witness Erwin Anslum who testified he was familiar with Barnett's Cove area and first noticed the emergence of an island some distance from the shore "six or seven years ago." Anslum conceded he was never in the area during real low water except once when he went there hunting about three years previously at which time as he expressed it "I walked through there. That was the time it was so low the water was mostly off everything." On this particular occasion, Anslum found a little stream or drain next to the bank. In addition, he stated that in the last eight years it was impossible to go into the area in a boat.
Columbus Voisin, called as appellants' witness, was somewhat equivocal and indefinite in his testimony. In essence he stated he had seen the area when the water was low and there was "a little bit of water", "something like a ditch", or "a drain." In this connection it is significant to note that appellants rely heavily upon the presence of this ditch or drain as proof that the batture is an island. In this respect they point to the testimony of Dr. Hanna who stated that in 1959 he traveled around the "island" in a boat. Appellant's contention in this regard, however, is refuted by Professor McDowell whose testimony and subsurface charts of record explain this phenomenon as hereinbefore set forth and establishes, as we have herein previously concluded, that the batture did in fact build up from the shore outward to the north. Under the circumstances, the presence of the ditch or drain, even though it may at times contain water, neither characterizes the accretion as an island nor alters its nature as a true batture composed of alluvial material carried to and deposited on the site by the currents present in Six Mile Lake.
The alternative contention of appellants that Article 509, LSA-C.C. is inapplicable because the currents in Six Mile Lake have been affected by certain man made works such as the dredging of the Channel along the east side of Grand Lake in or about 1940 and the dredging of Wax Lake Outlet, thus producing a current capable of carrying alluvial material or accelerating the normal rate of deposit so that the resultant accretion may not be said to have been formed successively and imperceptibly, is without merit in view of the pronouncements contained in Amerada Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So.2d 61, and Esso Standard Oil Company v. Jones, 233 La. 915, 98 So.2d 236.
In the Esso Standard Oil Company case, supra, the court was called upon to determine ownership of land formerly constituting a portion of the bed of the Mississippi River and situated in Deer Park Bend, a *380 segment of the river from which the main channel had been diverted by an artificial channel dug by the United States Corps of Engineers. The contention was therein raised that the rules of accretion were inapplicable inasmuch as the hand of man intervened. Noting that in First Amerada, notwithstanding the hand of man played a part in the formation of the alluvial deposit in controversy, the court nevertheless applied the provisions of Article 509, LSA-C.C., the court in the Esso Standard Oil Company case, then reaffirmed the rule thus pronounced in First Amerada by holding as follows:
"`In the present case at the present time there is not a constant or continuous flow at low water around the bendway every day in every year, but definitely the bendway is not a lake. When it does flow it is not drainage and the bendway gets its water from the main body of the Mississippi River. A stream is not required to flow every minute of the time. In this case the bendway is characterized by definite banks on each side, a definite bed, a natural current always downstream with the main body of the Mississippi River being the source of water supply. The current is capable of carrying alluvion and of depositing it along the banks. These characteristics fulfill every possible requirement of a stream and prevent the Deer Park Bend channel from being classified as a lake or pond up to this time. That location may change some time in the future becoming a dead lake, but it has not done so at this writing.'"
While we are of the opinion the record preponderates in favor of the conclusion the accretion in question herein was to some extent accelerated by the works alluded to by appellants resulting in the alluvion being deposited during the period commencing approximately in 1942 and continuing to the present time, such circumstance has no bearing upon the applicability of Article 509, LSA-C.C.
According to the rule laid down in Esso Standard Oil Company v. Jones, supra, in which substantially the same contention was advanced, although the works of man may accelerate the rate of alluvial accretion or deposit, such deposit is nevertheless deemed gradual, successive and imperceptible so long as the rate is such that its growth is not discernible at a given moment. As was stated in the Esso Standard Oil Company case, supra, the imperceptibility of alluvial deposits is likened to the growth of a flower. Granting that some flowers grow infinitely more rapid than others, such growth, nevertheless, is imperceptible so long as a spectator standing on the side is unable to perceive the growth at a particular moment of time. The record in the case at bar is barren of proof that a spectator viewing the area could, at any given moment, perceive the alluvial deposit being formed. On the contrary, it is clear from the record that the batture in question was gradually and imperceptibly formed by the currents of Six Mile Lake.
We come now to appellants' final contention, namely, that appellant, State of Louisiana, is entitled to be decreed owner of the minerals underlying the batture because of the provisions of LSA-R.S. 9:1151 (Act 341 of 1952) which states that in the case of accretions the riparian owner acquires title subject to any outstanding oil, gas and mineral leases with which the alluvian may be burdened at the time of its formation. Predicated upon this statute, the state maintains the batture in question did not emerge above the ordinary low water stage until after execution of the lease to plaintiff, Gulf Oil Corporation, in 1956.
The hereinabove reviewed lay testimony establishes the batture first became emergent in about 1952 and was fully emergent above the ordinary low water mark prior to 1956. This conclusion is strengthened by the evidence of Professor McDowell who based on stereoscopic and ordinary visual examination of certain photographs *381 made of the area during the period 1947-1952, in essence, testified some of the batture was emergent as early as 1947 and by 1952 a considerable portion thereof was above ordinary low water. We find, as did our learned brother below, the batture in question was emergent prior to the granting of the lease to plaintiff, Gulf Oil Corporation, in 1956. It follows that LSA-R.S. 9:1151, relied upon by appellants, is inapplicable thereby obviating the necessity of our passing upon appellees' alternative contention that said statute is invalid and unconstitutional.
We deem it advisable at this juncture to comment upon appellees' remaining alternative contention that our learned brother below erred in improperly shifting to defendants the burden of proving their case without first requiring appellants, as plaintiff in a petitory action, to make out a prima facie title. Assuming arguendo, the trial court was in error as appellees contend, in view of the conclusions herein reached appellees have suffered no injury. Therefore the error, if any, is inconsequential and has not prejudiced appellees' cause. Under such circumstances we do not consider resolution of the issue necessary to a decision in this matter.
Accordingly, the judgment of the trial court is affirmed at appellants' costs.
Affirmed.
HERGET, J., dissents.
HERGET, Judge (dissenting).
I feel compelled to make the observation, that since 1941 when I became a member of the judiciary I have never been accorded the pleasure of having a legal issue presented so expertly and thoroughly by counsel on both sides. In the trial court, in the briefs submitted and in the brilliant persuasive oral arguments in this Court, made by Mr. Plauche, for appellees, and Mr. Liskow, for appellants, the case has been painstakingly and assiduously handled.
The factual and legal questions presented for resolution of the issues involved have been meticulously enumerated in the opinion of the majority.
Inasmuch as the controversial water body was originally depicted on surveys and maps of the area as Lake Chetimaches and subsequently as Grand Lake and the segment herein involved as Six Mile Lake, and was recognized as a navigable body of water upon admission of Louisiana to the Union in 1812, by virtue of its sovereignty the State of Louisiana became the owner of all that portion thereof below mean high water mark. However, by virtue of LSA-C.C. Article 509 providing:
"Art. 509. The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion.
"The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or stream, and whether the same be navigable or not, who is bound to leave public that portion of the bank which is required by law for the public use."
as to the owner of soil situated on the edge of a river or stream, the riparian ownership of the accretions formed successively and imperceptibly to any soil situated on the shore of a river or other stream called alluvion belongs to the riparian owner. The queries raised in this case are twofold: (1) Is the land in controversy alluvion within the definition of the article? And (2) Is Six Mile Lake a river or stream? The burden of proof thus rests upon Defendants-Appellees to prove the affirmative to both of these questions.
In interpreting the statutes of this State, we are admonished in the following articles of the Civil Code thus:
"Art. 13. Plain meaning of text
"Art. 13. When a law is clear and free from all ambiguity, the letter of *382 it is not to be disregarded, under the pretext of pursuing its spirit."
And
"Art. 14. Ordinary words
"Art. 14. The words of a law are generally to be understood in their most usual signification, without attending so much to the niceties of grammar rules as to the general and popular use of the words."
The State of Louisiana by virtue of its sovereignty is the owner of the bed of a navigable body of water to its borders and without a law specifically granting same to someone else, not by implication, the property in controversy belongs to the State.
In giving consideration to the question of whether Six Mile Lake is a river or stream as defined by LSA-C.C. Article 509the affirmative of which must be proved by Appelleesit appears to me to be logical to give application to LSA-C.C. Article 14, supra, and attribute to the Legislature the intention to use such words in the general and popular use attributed to them on the date of its enactment. Inasmuch as without question all of the surveys, maps and reports and the government surveys made at the time of the adoption of LSA-C.C. Article 509 alluded to the body of water herein involved as a lake, it appears illogical to me the Legislature intended to classify such body of water as a river or stream.
The Supreme Court in the landmark case of Zeller v. Southern Yacht Club, 34 La. Ann. 837, observed:
"The plaintiff, however, denies that Lake Pontchartrain is either the sea or an arm of the sea, and, therefore, contends that this question of accretions or alluvion on the sea shores has no applicability to this case. It might be a sufficient reply to this, to say, that the only acknowledged right to accretions as property under our law, are those formed on rivers and running streams; and that there is no recognition of any property right therein, when formed on lakes, bays, arms of the sea, or other large bodies of water, and that the modes of ways of the acquisition of property are limited to those expressly prescribed by law and cannot be extended by implication. But we consider this question virtually disposed of in the case of Milne vs. Girodeau, 12 L 324. That was a petitory action to recover a lot lying on the same body of water, Lake Pontchartrain. On this lot the defendant had erected buildings. In the opinion of the Court it is stated:
"`The defendant, who is in possession, avers in his answer that it makes a part of the sea shore, is common property, and that plaintiff cannot have the ownership thereof.
"`It appears to us that the ground in question lies much below high water mark, and forms part of the bed of the lake, and is not, therefore, susceptible of private ownership.'"
The Trial Court concluded and its conclusions were affirmed by the majority herein, the Supreme Court in the case of Amerada Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So.2d 61, resolved such issue when it heldaccording to their interpretation of the decision any body of water capable of forming accretions is to be considered a stream within the meaning of the words "or other stream" in Article 509 of the LSA-Civil Code. The basis for the conclusion of the Trial Court and of the majority of this Court that such definition of a stream is correct, is garnered from said opinion wherein the Supreme Court copiously quoted the learned Trial Judge's written reasons, including, at page 69 of 14 So.2d:
"`* * * All streams whose water have the power to form accretions; and as the stream with which we are herein concerned has the power to form accretions, as it has done, it is then plain *383 to me that it falls within the category of the streams mentioned in the cited article, and therefore, all accretions forming to its shores or banks belonging to the abutting property owners.'"
In the Amerada case supra, the Trial Court referred to Black's Law Dictionary for the definition of a lake, and then observed, as quoted in the opinion of the Supreme Court:
"`According to these definitions we must, therefore, note that a lake does not imply a body of water in which a current flows, but it indicates a body of water, more or less, stagnant, in which the water is supplied from drainage. * * *'"
and concluded as to the arm of Grand Lake therein in controversy:
"`It cannot be classified as a river, because it does not possess well defined banks or walls as are required of rivers, and it cannot be called a lake because its waters are not still or dead and the waters are not supplied from drainage as is required of lakes.'"
and thereupon concluded:
"`* * * All streams whose water have the power to form accretions; and as the stream with which we are herein concerned has the power to form accretions, as it has done, it is then plain to me that it falls within the category of the streams mentioned in the cited article, and therefore, all accretions forming to its shores or banks belonging to the abutting property owners.'"
In my opinion the question presented was whether in fact the arm of Grand Lake was a river or stream within the meaning of LSA-C.C. Article 509 not whether it was a lake, and inasmuch as by the Agreed Stipulation of Fact therein entered into by counsel it was agreed the body of water flowed between banks and its width between banks at two separate and distinct points was given, it was sound reasoning to conclude same was a stream within the meaning of LSA-C.C. Article 509. However, in my opinion this case is not authority for the contention made in respect to the water bottoms involved in the present case inasmuch as from the beginning it is shown the body of water has been referred to as a lake and there is no evidence to show same flowed between banks.
I further observe, to adopt the view of the majority it would confine the definition of a lake to that of a stagnant body of water, despite the surveys and maps in existence upon the adoption by the Legislature of LSA-C.C. Article 509 depicted the body of water as a lake, and which characterization the Legislature must have known.
From the evidence, in my opinion, the factual issues presented as to whether Six Mile Lake is a river or stream are the same as those found to exist in the case of State v. Erwin, 173 La. 507, 138 So. 84, wherein the Supreme Court determined Calcasieu Lake was in fact a lake, though the waters of the Calcasieu River flowed therethrough to reach the sea. I further observe in Amerada Petroleum Corporation v. Case, 210 La. 630, 27 So.2d 431, the Supreme Court in considering its interpretation of the Amerada Petroleum case, supra (203 La. 473, 14 So.2d 61) restricted its holding to the body of water therein involved "arm of Grand Lake" and observed at page 432 of 27 So.2d:
"The only difference between that case and this is that the location of the well in this case is nearer to the place where the so-called arm of Grand Lake enters into and becomes a part of Grand Lake itself. * * *" (Emphasis mine).
making evident its conclusion, Grand Lake, of which Six Mile Lake is a segment, was in fact a lake.
I am further persuaded in my opinion that the Supreme Court did not intend to adopt as a definition of a stream, any body *384 of water capable of forming accretions a stream within the meaning of the words "or other stream" in LSA-C.C. Article 509, for, had such been the intention of the Court in reviewing the first Amerada case [203 La. 473, 14 So.2d 61] in the second Amerada case [210 La. 630, 27 So.2d 431] that Court would simply have held Grand Lake as well as the arm of Grand Lake was a stream within the meaning of its definition and would have in nowise made the basis of its decision the fact the land involved in the second Amerada case was on the same continuous formation adjacent to the lot in controversy in the first Amerada case.
In my opinion the case of Esso Standard Oil Company v. Jones, 233 La. 915, 98 So. 2d 236 is inapposite to the factual situation involved herein, for, in fact, the issue there involved was in reference to the riparian rights of ownership of land fronting on a channel of the Mississippi River.
To adopt the definition of a "stream" enunciated by the majority would mean that Lake Pontchartrain through which flows many rivers and streams to their ultimate destinationthe Gulf of Mexico, and as to which the Supreme Court in Zeller v. Southern Yacht Club, supra, observed:
"* * * the only acknowledged right to accretions as property under our law, are those formed on rivers and running streams; and that there is no recognition of any property right therein, when formed on lakes, bays, arms of the sea, or other large bodies of water, * * *.",
thus categorizing Lake Pontchartrain as a lake or a bay or an arm of the sea or other large body of water should be re-classified as a stream. Indeed, to accept the definition accorded to the word "stream" by the majority would mean that the Atlantic Ocean through which the Gulf stream flows at a rapid rate and without question makes imperceptible accretions on the shores thereof is not in fact an ocean but a stream.
Having concluded Appellees have failed to sustain the burden of proof that Six Mile Lake is a stream, the next question is the land in controversy alluvion within the definition of the article becomes moot. For, to acquire ownership of the alluvion, the ownership of land on a river or stream by the riparian owner is essential.
In closing, because of the very important legal question raised affecting ownership of lands in Louisiana involving millions of dollars due to the production of oil, I respectfully suggest writs of certiorari should be granted by the Supreme Court, to put at rest this most important legal question and not leave to conjecture the question whether "or other streams" as provided in LSA-C.C. Article 509 means any body of water which has the power to form accretions and that a lake is a stagnant body of water.
For these reasons I respectfully dissent.