Dear Senator Smith:
You have requested an opinion of this Office regarding the State's ownership and control of certain water bottoms in the Red River in Rapides Parish. The basic facts behind your opinion request relate to a Corps of Engineers ("the Corps") construction of a straight-away cut across private property to straighten the flow of the Red River. Now that the original river bed is silting in, you want to know who owns what property in the area of the original water course and the new cut.
In a recent opinion, La. Atty. Gen. Op. No. 06-0263, this Office opined that, where an oxbow lake is created by a cut made by the Corps in a navigable river of this State, the landowner across whose property the channel was made retains ownership of the bottom of that channel, even when it becomes the main flow of the river.[1] The State, in such a scenario, retains ownership of the oxbow as a lake.[2] Should an oxbow lake owned by the State dry up, this property will remain in the ownership of the State, as the laws of accretion do not apply to lakes.See, Esso Standard Oil Co. v. Jones, 98 So.2d 236, 245-6, on reh'g (La. 1957); see also, John L. Madden, FEDERAL AND STATE LANDS IN LOUISIANA, 327-8 (Claitor's Publishing Division 1972). It is apparent that, while similar, the same situation does not apply to the current matter. However, the facts of the current request, unfortunately, do not lead to a completely clear answer, leaving open the possibility that La. Atty. Gen. Op. No. 06-0263 could indeed apply to some of the property at issue in this matter, but not to other portions thereof.
During the 1980s, the Corps cut a channel along the Red River to improve the flow of that waterway. The practical effect of creating this channel was to create a straight-away in the River where a sharp curve had naturally occurred. As the River was straightened the main flow largely abandoned the natural curve, *Page 2 
resulting in a silting-in of part or all of the original bodies of water, possibly creating an oxbow lake.[3]
Ownership of the Red River Channels
As a general matter, the Louisiana Civil Code holds that "[p]ublic things that belong to the state are such as running waters, the waters and bottoms of natural navigable water bodies, the territorial sea, and the seashore."[4] Thus any analysis of the ownership of a water bottom must begin with the general premise that the State is the owner of the beds of all navigable water bodies within its borders. The Red River is unquestionably a navigable waterway of the State. Thus, in a typical situation, the State would be the owner of the bottom of the Red River as it traverses the Corps channel.
However, as noted above, the Red River has not always traversed this property. Sometime in the late 1980s, the Corps, in an effort to facilitate the more efficient navigation of the Red River, cut the current channel. The property over which the Red River cut was made by the Corps was acquired via a document that purports to be a servitude. Although a servitude would typically contemplate a situation whereby the State has a right of passage over the newly-created privately owned water bottoms resulting from the cut made by the Corps, as is the case in La. Atty. Gen. Op. No. 06-0263, there are certain instances in which the State actually acquires a full ownership interest in the property. It is the opinion of this Office, from a reading of the pertinent legal document authorizing the Corps' cut, that the latter is not the case in the current matter: the State has not acquired ownership of the water bottom in the subject cut.
Each of the Corps cuts in water courses throughout the State presents a unique set of facts. It is impossible, in an opinion regarding a particular Corps channel, to create a rule that will apply to every channel around the State. Each channel was created based on unique documents to acquire some interest in the property, each was created at a different time (meaning that as the law changed over time, different rules applied to ownership), and the hydrological and geological processes that acted upon the original channels after the cuts were made differ substantially from one cut to another and are often incompletely documented. All of these factors make generalizations about the ownership of such channels impossible. However, we here endeavor to set forth a series of processes for analyzing such ownership under certain conditions and then apply those processes to the current question. *Page 3 
Servitude v. Fee Title
As has been noted in numerous cases in this State, whether an instrument purports to convey a servitude or fee title to a party depends first on the ambiguity inherent in the particular document. See, EssoStandard Oil Co. v. Texas New Orleans Railroad Co., 127 So.2d 551
(La.App. 3 Cir. 1961); Porter v. Acadia-Vermilion Irrigation Co., Inc.,479 So.2d 1003 (La.App. 3 Cir. 1985). There is a strong argument that the servitude agreement was a transfer of fee title to the Red River Waterways District because of the mineral reservation contained therein. Such would be useless in a servitude. However, we reserve judgment on the question of ownership of the bed of the new channel. Nonetheless, the practical effects of each outcome are the same: the minerals remain with the original owner.
Under the above-cited case law, if there is no ambiguity in the document conveying an interest in the particular property, extrinsic evidence cannot be considered and the conveyance must be interpreted based on the language contained within the four corners of the document.Id. If it is clear from the language of the document that what was intended to be conveyed was a servitude, or, conversely, a fee simple title, then no further inquiry can be made. If, on the other hand, ambiguity does exist or an application of the instrument as it is styled would lead to absurd consequences, extrinsic evidence may be considered.Porter, supra, at 1006. Ambiguity may be inferred from such things as a disproportionate price paid for the interest purported to be conveyed; a caption of the document that does not conform to the stated purposes in the text; language in a servitude that grants the right "forever" or language in a cash sale that grants the right "in perpetuity"; among other factors.
Once ambiguity has been identified, the Porter court proposes the following questionnaire to determine whether an instrument is a servitude or a cash sale.
 Our jurisprudence notes several factors which should be considered when deciding whether fee title or a servitude has been conveyed . . . These factors include:
 1. The consideration recited in the deed;
 2. Whether a specific measurement was given to the "right-of-way";
 3. Whether the party claiming the fee title had an actual need for such title;
 4. To whom the property was assessed and who paid the taxes on the property;
 5. Whether the grant was made for a specific purpose;
 6. Whether the grant was made "in perpetuity" or "forever"; and, *Page 4 
 7. How the parties to the conveyance, or their heirs and assigns, have treated the property.
Porter, supra, at 1007. The ideas behind these factors are fairly straight-forward. If the consideration in the instrument approaches the fair market value for the cost of the property, that factor lends towards a finding of fee title. If specific measurements were given to the property to be contained within the servitude or the right-of-way, this too lends towards a finding of fee title, as exactness of property description is a hallmark of a sale. In cases involving Corps channel cuts, the third factor above should always support the acquisition of fee title. The acquiring entity will always have a need for the fee title, as the whole purpose of making the cut is to ensure the perpetual flow of a waterway. It would seem nonsensical to acquire a servitude for a channel that is anticipated to carry the waters of the State forever. As to the fourth factor, if the original landowner continues to pay taxes on the property, this lends to a finding that a servitude was granted. Factor five examines whether there was a specific purpose for the conveyance. It is unclear from Porter, but presumably if property were conveyed for a specific purpose and that purpose had an indefinite duration (e.g., a channel cut), that this factor would lend towards a finding of fee title. As noted by the Porter court regarding the sixth factor, "a grant `in perpetuity' connotes only a limited grant, whereby a grant `forever' connotes an unlimited grant and a sale in fee simple." Id. at 1008. The final factor often dovetails back to factor four. It is often difficult to ascertain what the intentions of the grantors were in such agreements. The payment of taxes can provide some insight into what the grantors and their heirs or assigns believed their interest in the property was. Also informative with respect to this factor could be subsequent sales of the property which may or may not mention a fee title interest to another party of the tract of land in question, such as a "bounding owner", or the opposite, such as "bounded by the right-of-way of [so-and-so]".
Should the language of a conveyance be ambiguous or lead to absurd consequences, the above-noted inquiry should be undertaken to determine whether a servitude or fee title has been acquired by the State with respect to Corps channel cuts. The only way to be certain about the interpretation of such contracts would be to obtain a declaratory judgment from a court of competent jurisdiction, an action which we here recommend.
The Silting of Old Channels: Three Possible Outcomes Based onGeomorphology and the Law
There are three possible outcomes for the ownership of a silted-in old river channel, all of which are discussed more fully below. The first scenario contemplates a situation whereby an oxbow lake is formed where the old channel used to be. The second two possible outcomes are legal distinctions of the same geomorphological phenomenon. In these outcomes, which contemplate that no *Page 5 
oxbow was created and one of which does not apply to the current matter, depending on when the cut was made and when the silting occurred, there will be a difference of ownership of accretion based on a change in the law in the late 1970s.
Formation of an Oxbow Lake
The simplest outcome would result from the silted channel forming a traditional oxbow lake. It is well accepted that, once an oxbow forms from the movement of a navigable water body, it becomes a lake in the legal sense of the term.[5] Thus, as with all navigable lakes in existence prior to 1812, as the oxbow dries, the newly-dry land does not inure to the ownership of the riparian landowners, but rather to the State.[6] The question then becomes, when did the oxbow lake form? According to State v. Bourdon, 535 So.2d 1091 (La.App. 2 Cir. 1988), if a navigable oxbow lake was formed prior to statehood in 1812, it became the property of the State at statehood, and has remained as such since. However, navigable oxbows formed since 1812 become, through indemnification,[7] the property of the landowner whose property was inundated when the navigable waterway that used to run through the oxbow channel moves.
The Bourdon case presents a unique problem when considering artificial channels in Louisiana. Situations in which the Corps of Engineers or other entity has created an artificial cut in a navigable waterway, thus creating a new main channel of that waterway, are not contemplated by the laws related to water bottom ownership and accretion in the Louisiana Civil Code.[8] In most of these cases, the Corps or other entity does not purchase the property underlying the new channel outright. Rather, it obtains a servitude from the landowner and proceeds to reroute the water through this formerly dry property.[9] This scenario is substantially different from the law on the ownership of water bottoms when a natural (even if abetted or accelerated by the act of man) change in the course of a navigable waterway occurs.[10] Under that general law, the State takes ownership of the newly-inundated water bottom and the landowner whose land has disappeared beneath the water take by indemnification from the abandoned bed of the waterway. *Page 6 
However, in situations such as the one described in your opinion request, the State does not gain an ownership interest in the newly-inundated water bottom due to the existence of the servitude (subject to a finding that the servitude is a servitude and not a transfer of fee title). Accordingly, the landowner has not lost his now-inundated property and, indeed, he was compensated for its use as a water way. Thus, it is our opinion that there is no indemnification owed. The landowner retains ownership of and minerals beneath the channel cut and the State retains ownership of and minerals beneath the original water bottom.
Although it is also our opinion that the laws of accretion, in the traditional sense of accretion, may apply to the current situation, it seems that, for reasons of equity, the original channel of a navigable waterway must be treated somewhat differently when the landowner retains ownership of the newly-created water bottom. These laws are intended to return land to the stream of commerce as it emerges from the bottoms of State water bodies. However, again, the Civil Code articles related to accretion,[11] which are based on ancient French and Roman laws,[12]
do not contemplate the massive earth-moving works of the modern Corps of Engineers.
In this instance, the original path of the Red River did not accrete by natural forces. The River filled in as a direct result of anthropogenic factors and, unlike the traditional situation, the State did not obtain an interest in the newly formed water bottom. As a result of this inequity to the citizens of Louisiana,[13] it is our opinion that, so long as an original channel of a navigable waterway remains inundated (as with an oxbow lake or via a direct opening to the new channel), that property remains with the State and the only way for the adjacent landowners to gain an interest in the property is through the law of accretion.
Thus, unlike the general rule that, once formed, a navigable oxbow lake created post-1812 becomes the property of the private landowner,[14]
when the oxbow is formed as a result of an artificial cut in which the State gains no interest in the new channel, ownership of the old water bottom remains with the State and can only be lost through the law of accretion. If the oxbow becomes a lake in the true sense of the word (i.e., cut off from the old channel at both ends), the law of *Page 7 
accretion does not apply,[15] and the dried water bottom remains the property of the State.
If the old river channel at issue here, in whole or in part, formed an oxbow lake and that lake, navigable-in-fact and thus navigable-in-law, has, over time, dried up, then the bed of that portion of the channel that was the oxbow lake belongs to the State. It is unclear from the information available in the State Land Office how much of the old channel in the present matter ever constituted an oxbow lake, though it does appear that some amount did. Whatever portion of the old channel became a true oxbow lake would remain the property of the State, even as it dried. In any case, all minerals underneath a dried oxbow lake would similarly remain in the ownership of the State.
Accretion in the Absence of an Oxbow Lake
For the other two outcomes we must assume, arguendo, that the channel is legally considered a river or a stream and not a lake and we thus contemplate a scenario whereby an oxbow lake is not formed by the movement of silt into the old channel. The ownership distinction between these outcomes is made based on the actual time at which the Corps cut was made. The reason for this is that the Civil Code articles related to accretion to islands were changed in 1978.[16] This is relevant because the Corps cut effectively created, for a time, an island within the stream of the Red River.
If, as is not the case here, a channel cut was begun before the changes to the Code, some or all of the silt that accreted to the island would inure to the State, while the accretion on the other bank (the nonisland side of the channel) would inure to the riparian owner. This follows from the theory that accretion, in the strict legal sense of the term, cannot occur to islands under the applicable pre-1978 Civil Code articles.[17]
However, if, as is the situation here, a channel cut was made after the Code was changed, it appears likely that all of the accretion, whether on the island side or the nonisland side of the channel, would inure to the riparian landowners. Thus, any area of a silted-in channel that was not once a true oxbow lake, for channelization occurring after the Civil Code was revised in 1978, accretion becomes the private property of the riparian landowners. *Page 8 
Conclusion
As to the ownership of the new bed of the Red River as it traverses the Corps cut, a matter indelibly linked to the current analysis, it is the opinion of this Office that there was no ambiguity in the servitude agreement sufficient to conduct a Porter analysis of whether a fee title was granted rather than a servitude (i.e., the grant was of a servitudeonly). Thus, it is further the opinion of this Office that the ownership of the land underlying the current channel, with its attendant mineral rights, remains the property of the private landowner from whom the servitude was acquired.
Without a precise reconstruction of the events leading to the silting of the old channel, it is impossible to provide a certain answer to the question of who now owns the dried-up river bed where the Red River used to flow. As best this Office can tell, depending on the facts, there are at least two possible outcomes to this question:
 (1)a true oxbow lake was formed in a portion of the old channel and the dried-up property attributable to that former lakebed is now State property; or
 (2) no oxbow was formed; the normal process of accretion occurred in the old channel; and, because the cut was made after the 1978 revisions to the Civil Code, the accreted property inured to the benefit of the riparian landowners.
It is clear that the history of the Red River since the time the Corps made the cut in question does not lend to black and white answers to seemingly simple questions. There is simply not enough factual information in evidence at this time to completely reconstruct the history of this area.
Ultimately, because of the unclear nature of the silting of the old channel in the current matter, all interested parties, the State and the riparian landowners, should maintain their claims to the now dry bed pending more comprehensive evidence becoming available. To do otherwise, and in the absence of a judicial ruling to the contrary, could be, on behalf of the State, a donation of property to the riparian owners in violation of La.Const. Art. VII, Sec. 14, and could be, on behalf of the riparian owners, a potential relinquishment of their private property interests.
Accordingly, should someone desire a right of passage across the disputed property, we see two possible alternatives to securing such a right. One option would be for the interested party to acquire right of passage agreements with each of the possible owners: the State and the riparian landowners. The second option is for one or more of the possible owners to file an action for declaratory *Page 9 
judgment in a court of competent jurisdiction and introduce expert testimony and evidence as to the geomorphological history of the old bed in order to obtain a final judgment on the issue of ownership.
Although it is difficult to reach a clear conclusion in this opinion as to who actually owns what in the subject area, this opinion is still relevant. First, it illustrates the difficulty of making ownership calls in cases such as this, owing to the fact-specific and fact-intensive nature of such claims. Second, it illustrates a standard for establishing ownership in certain situations involving Corps-cut channels. Nonetheless, the general conclusion remains clear: without an order of a court of competent jurisdiction, the ownership of the land adjacent to the new Corps-cut channel is so unclear that anyone wishing a right of way across said property would be best served and best protected by securing agreements from all potentially interested parties.
We hope this sufficiently answers your inquiry, however if we may be of further assistance please do not hesitate to contact our office.
 Sincerely yours,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
 By: ___________________ RYAN M. SEIDEMANN IRYS L.V. ALLGOOD
 ANDREW J. S. JUMONVILLE Assistant Attorneys General
 CCF, Jr./RMS/ILVA/AJSJ/tp
[1] The conclusion that permitted the landowner to retain ownership of the water bottom in that opinion was based on the existence of a servitude, as in the current situation, that permitted the channel to be cut, but retained ownership with the private landowner.
[2] This general maxim, and its exceptions, is explained further below.
[3] We state that an oxbow lake was "possibly" created because the factual information available to this Office at this time does not lead to a clear conclusion as to whether a true oxbow existed in the area of the subject cut.
[4] La.C.C. Art. 450.
[5] See, A.N. Yiannopoulas, PROPERTY, LOUISIANA CIVIL LAW TREATISE, Vol. 2, 4th ed., § 76 (West 2001). Just because a navigable portion of a river or stream becomes a lake in the legal sense of the term does not necessarily mean that the ownership of that new water body remains with the State — this scenario is detailed in the text below.
[6] See, State v. Placid Oil Co., 300 So.2d 154 (La. 1974) for a discussion of the inapplicability of the law of accretion to lakes;see also, La.C.C. Art 500.
[7] The indemnification referred to here is the indemnification contemplated in La.C.C. Art. 504.
[8] See, La.C.C. Arts. 499—501; see also, La.C.C. Arts. 502—505 for other relevant laws.
[9] Such was the case with the property that was the subject of La. Atty. Gen. Op. No. 06-0263 and is also the case with the property that is the subject of this opinion request.
[10] La.C.C. Arts. 502 and 504.
[11] La.C.C. Arts. 499—501.
[12] See, A.N. Yiannopoulas, PROPERTY, LOUISIANA CIVIL LAW TREATISE, Vol. 3,4th ed., § 49.
[13] The inequity referred to here is based on the scenario where a Corps channel is cut pursuant to a servitude — meaning that the State does not have an ownership interest in the new water bottom — and the general laws of accretion come into play on the former channel. In this instance, the State would lose its interest in the former bed, assuming that accretion did in fact occur, but would gain no interest through indemnification as to the new channel because of the servitude. This situation is vastly different from that contemplate by the Civil Code in Article 504 and would cause an inequity to the citizens of the State in that property would be lost with no correlative gain as envisioned by the Civil Code. Thus, the citizens stand to lose the benefits that inure to the State by virtue of the ownership of a navigable water bottom.
[14] See generally, State v. Bourdon.
[15] La.C.C. Art. 500.
[16] La.C.C. Arts. 456, 499, and 665 (former articles 455, 509, and 665).
[17] Andrew J.S. Jumonville, Accretion in the Atchafalaya Basin:Present and Future Title Controversies, Presentation to the Louisiana Mineral Law Institute, 1974 at 19-21 (unpublished conference presentation on file with the Louisiana Department of Justice).